XIN–CHANG Zhang, A72–762–145, Petitioner,

v.

William SLATTERY, INS District Director for Detention and Deportation, Roseanne Sonchik, INS Acting Assistant District Director for Deportation, and Charlene Monroe, INS Immigration Officer, Respondents.

No. 94 Civ. 2119 (RPP).

United States District Court, S.D. New York.

Aug. 5, 1994.

Davis Polk & Wardwell by Niall J. Lenihan, New York City, for petitioner Xin–Chang Zhang.

Mary Jo White, U.S. Atty., S.D.N.Y. by F. James Loprest, New York City, for respondents William Slattery, Roseanne Sonchik, and Charlene Monroe.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Xin–Chang Zhang petitions this Court pursuant to 8 U.S.C. § 1105(a)(10) for a writ of habeas corpus to review the determinations of the Board of Immigration Appeals ("BIA") denying Petitioner's application for asylum and upholding Petitioner's placement in exclusion rather than deportation proceedings. For the reasons stated below, the BIA's determinations are remanded.

## BACKGROUND

The smuggling ship Golden Venture ran aground off the beaches of Rockaway, Queens on June 6, 1993. Petitioner Xin–Chang Zhang, a passenger and a national of the People's Republic of China, swam ashore where he was taken into custody by law enforcement officials and subsequently transferred into the custody of the INS. Petitioner was placed in exclusion proceedings and, in separate hearings before an immigration judge, petitioned for asylum and moved to terminate his exclusion proceedings. Petitioner subsequently appealed to the BIA on both issues.

### Petitioner's Experience in China

Petitioner states that in October 1991, one month after the birth of his first child, Petitioner was asked by local officials in Chang Le County in Fu Jian Province that he or his wife undergo sterilization surgery pursuant to China's one child per family policy. (Lenihan Aff.Ex. 31, ¶¶ 2, 11–12). Petitioner further states that local officials usually do not pressure people to undergo sterilization after having only one child, and that Petitioner was singled-out because he had had a quarrel with a powerful neighbor. *Id.* ¶ 17. Petitioner states that he and his wife opposed sterilization because they wanted to have more children and feared the health effects of sterilization surgery. *Id.* ¶ 18.

### Petitioner's Flight from China

Petitioner states that, in order to avoid sterilization, he and his wife fled from their home and went into hiding separately. (Lenihan Aff.Ex. 31, ¶¶ 18–20). After working for approximately six months, Petitioner hired

professional smugglers to take him to the United States, paying $5,000 in advance and agreeing to pay an additional $25,000 after arriving in the United States. *Id.* ¶¶ 25–26. After more than three months at sea, Petitioner arrived in the United States aboard the Golden Venture, which ran aground approximately 100 to 200 feet off the Rockaway Beach in Queens, New York. (Lenihan Aff. Ex. 1 at 3). Petitioner states that, after the ship ran aground, there were "helicopters with floodlights flying over the Golden Venture and rescue boats in the water." (Lenihan Aff.Ex. 31, ¶ 44). Petitioner climbed down a ladder into the water and swam ashore. *Id.* ¶ 45. When Petitioner arrived on the beach, he "walked a few steps and then collapsed to the ground"; the police were a short distance away and took Petitioner into custody. *Id.* ¶ 46.

An immigration judge ("IJ") found that Petitioner was properly placed in exclusion proceedings because he had not made "entry" into the United States, (Lenihan Aff.Ex. 1 at 7), and denied Petitioner's application for asylum on the grounds that Petitioner had not established a well-founded fear of persecution within the meaning of the asylum laws. (Lenihan Aff.Ex. 2 at 30). On March 22, 1994, the Board of Immigration Appeals ("BIA") upheld both conclusions of the IJ. (Lenihan Aff.Ex. 3).

## DISCUSSION

### I. Standard of Review

■ The BIA's conclusions of law are reviewed de novo. *Sotelo–Aquije v. Slattery,* 17 F.3d 33, 35 (2d Cir.1994); *Abedini v. United States Immigration and Naturalization Serv.,* 971 F.2d 188, 190–91 (9th Cir. 1992). "The BIA's factual findings ... must be upheld if supported by substantial evidence." *Sotelo–Aquije,* 17 F.3d at 35.

### II. Petitioner's application for asylum

Section 1158 of 8 U.S.C. provides: "[An] alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refu-

gee within the meaning of section 1101(a)(42)(A) of this title." Section 1101(a)(42)(A) defines "refugee" as:

[A]ny person who is outside any country of such person's nationality ... who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The IJ concluded that Petitioner did not meet this definition: "[T]his court believes that it has no choice but to apply *Matter of Chang,* [Interim Decision 3107 (BIA 1989), which held that] ... the implementation of the one-couple, one-child policy in and of itself even to the extent that involuntary sterilizations may occur is [not] persecution [nor does it] create[ ] a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." (Lenihan Aff. Ex. 2 at 23). On appeal, the BIA stated: "[W]e conclude that the immigration judge's decision was correct, and we adopt as our own his findings of fact and conclusions of law on the asylum issue." (Lenihan Aff.Ex. 3 at 6). Thus the IJ and the BIA concluded that Petitioner had not established political refugee status as interpreted by the BIA in *Matter of Chang.*

■ Petitioner argues that the BIA erred in relying on *Matter of Chang* because the Attorney General overruled that decision in an unpublished final rule signed in January 1993 ("the January 1993 Rule").[1] The January 1993 Rule provides in relevant part:

§ 208.13(b)(2)(ii) An applicant [for asylum] ... shall be found to be a refugee on the basis of a well-founded fear of persecution on account of political opinion if the applicant establishes a well-founded fear that, pursuant to the implementation by the country of the applicant's nationality ... of a family planning policy that involves or results in forced abortion or coerced sterilization, that applicant will be

---

1. Decisions of the BIA are binding on the INS and immigration judges "[e]xcept as they may be

modified or overruled by the Board or the Attorney General...." 8 C.F.R. § 3.1(g).

forced to ... undergo sterilization or will be prosecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such fear.[2]

The supplementary information to the January 1993 Rule explains: "One effect of this rule is to supersede the Board [of Immigration Appeals] decision in *Matter of Chang,* Int.Dec. No. 3107 (BIA 1989)...." The rule recognizing that fear of persecution pursuant to a family planning policy for failure or refusal to undergo sterilization or abortion would be grounds for asylum was signed by the Attorney General on January 15, 1993, and scheduled to be published in the Federal Register on January 25 of that year. On January 23, 1993, the proposed Director of the Office of Management and Budget barred publication of any new rules until approved by an agency-head appointed by the newly inaugurated president. *Guo Chun Di v. Carroll,* 842 F.Supp. 858, 864 (E.D.Va. 1994). The January 1993 Rule although public was never published in the Federal Register.[3]

■ Petitioner argues that the January 1993 Rule is binding upon the INS, although a new administration stopped publication of the rule in the Federal Register. The Freedom of Information Act provides in relevant part:

Each agency shall separately state and currently publish in the Federal Register for the guidance of the public ... (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency.... [A] person may not in any manner be required to resort to, or be adversely affected by, a

matter required to be published in the Federal Register and not so published. 5 U.S.C. § 552(a)(1). The Second Circuit has stated: "[T]he requirement for publication [in 5 U.S.C. § 552(a)(1)(D) ] attaches only to matters which if not published would adversely affect a member of the public." *State of New York v. Lyng,* 829 F.2d 346, 354 (2d Cir.1987) (quoting *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971)). Accordingly, the Second Circuit stated, albeit in dicta: " '[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures....' even though the procedural requirement has not yet been published in the federal register." *Montilla v. Immigration and Naturalization Serv.,* 926 F.2d 162, 168 (2d Cir.1991) (reversing an order of the INS because the INS failed to follow a published rule which benefitted an alien) (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)). Thus, where a rule confers a substantive benefit to a person, an agency must comply with it, even if the rule is not published. *See also Nguyen v. United States,* 824 F.2d 697, 700 (9th Cir.1987) (stating that an unpublished rule which should have been published under 5 U.S.C. § 552(a)(1) is effective unless it adversely affects a person's substantive rights).

■ The January 1993 Rule is not adverse to Petitioner but confers upon him the benefit of an expanded interpretation of the standards for refugee status. Furthermore, the government does not argue that the January 1993 Rule is adverse to the INS. Therefore, the January 1993 Rule, which does not affect petitioner adversely, became effective despite the agency's failure to publish it in the Federal Register in accordance with 5 U.S.C. § 552(a)(1).[4]

---

**2.** The January 1993 Rule is included in Lenihan Aff., Ex. B, and is quoted in *Guo Chun Di v. Carroll,* 842 F.Supp. 858, 864 n. 5 (E.D.Va.1994).

**3.** The government contends that this Court may not consider whether the January 1993 Rule is effective because Petitioner did not present this issue to the BIA. Petitioner, however, included in his brief to BIA a thorough discussion of the effectiveness of an interim regulation published in 1990 on which the January 1993 Rule was

based, and Petitioner noted that the Attorney General finalized the interim regulation in January 1993. (Return at 21–24 & n. 23). Petitioner's discussion and note was sufficient to preserve the issue for review by this Court.

**4.** The government argues that even if the January 1993 Rule became effective, it was rejected "by implication" in February 1993 when the incoming Attorney General published final regulations governing the adjudication of asylum applica-

■ The BIA failed to apply the legal standard mandated by the January 1993 Rule. The BIA concluded: "[T]he applicant's argument that the application of China's coercive family planning policy itself constitutes persecution within the meaning of the Act, is unpersuasive in light of our decision in *Matter of Chang*." (Lenihan Aff.Ex. 3 at 6). The BIA's decision to deny Petitioner's application for asylum is therefore remanded for application of the appropriate legal standard.[5]

### III. Petitioner's Entry into the United States

■ Petitioner contends that he had effected "entry" into the United States and, therefore, should have been in deportation rather than exclusion proceedings.[6] Although Title 8 United States Code, Section 1101(a)(13) defines "entry" as: "[A]ny coming of an alien into the United States from a foreign port or place or from an outlying possession, whether voluntary or otherwise ...," the Second Circuit has interpreted "entry" under the act as follows: "(1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint." *Correa v. Thornburgh*, 901 F.2d 1166, 1171 (2d Cir.1990) (quoting *Matter of Ching and Chen*, Interim Decision 2984, at 3 (BIA 1984)).

The IJ found Petitioner's testimony regarding his arrival in the United States credible, (Lenihan Aff.Ex. 1 at 4), but concluded as a matter of law that Petitioner failed to satisfy the second and third requirements to effect "entry." (Lenihan Aff.Ex. 1 at 5). The BIA upheld the IJ's conclusion. (Lenihan Aff.Ex. 3 at 4).

■ Petitioner argues that he effected entry after he crossed into the territorial waters of the United States. The IJ noted: "The Golden Venture clearly entered within the 12 mile limit of the United States...."

tions which made no reference to asylum claims premised upon family planning policies. (Government's Mem.Opp.Petition at 17). Annulment or voidance of the January 1993 Rule would be adverse to petitioner and therefore would be subject to the notice requirements of 5 U.S.C. § 552(a)(1). Annulment by implication drawn from the omission of the rule from the published regulations is not consistent with the notice requirements of that act. It should be noted that, in December 1993, the incoming Attorney General concluded that no determination is necessary concerning the applicability of *Matter of Chang* and did not comment on the January 1993 Rule. *Guo Chun Di v. Carroll*, 842 F.Supp. 858, 865 n. 9 (E.D.Va.1994).

**5.** Petitioner additionally argues that, regardless of his motivation for leaving China, he can establish refugee status based upon fear of punishment he may receive due to his illegal departure from China. The Supreme Court has stated: "The ordinary meaning of the phrase 'persecution on account of ... political opinion' in § 101(a)(42) is persecution on account of the *victim's* political opinion, not the persecutor's." *Immigration and Naturalization Serv. v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992). Thus, petitioner's motivation is necessarily relevant to the determination of refugee status.

Petitioner cites *Osorio v. Immigration and Naturalization Serv.*, 18 F.3d 1017 (2d Cir.1994) which states that the BIA "failed to give 'due *consideration* to evidence that the [Guatemalan government] persecutes its nationals or residents if they leave the country without authorization.' 8 C.F.R. § 208.13(b)(2)(ii)." *Id.* at 1032. Section 208.13(b)(2) provides:

An Applicant shall be found to have a well-founded fear of persecution if he can establish first, that he has a fear of persecution in his country of nationality ... on account of race, religion, nationality, membership in a particular social group, or political opinion, second, that there is a reasonable possibility of actually suffering such persecution if he were to return to that country....

Evidence that a government persecutes returning residents for illegal departure is to be considered in determining whether there is a reasonable possibility of actual suffering, 8 C.F.R. § 208.13(b)(2)(ii), but such evidence is not a statutory basis for fear of persecution under Section 202(b)(2). The court's conclusion in *Osorio* is consistent with this interpretation of 8 C.F.R. § 208.13(b)(2). *See Osorio*, 18 F.3d at 1031.

**6.** The Second Circuit has noted: "Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, and [in the event of deportation,] the right to designate the country of destination." *Correa v. Thornburgh*, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990).

(Lenihan Aff.Ex. 1 at 4) Thus, Petitioner was physically present in the United States. 8 C.F.R. § 287.1; *International Longshoremen's and Warehousemen's Union v. Meese*, 891 F.2d 1374, 1384 (9th Cir.1989). Unless an alien intends to be inspected, when he or she crosses a border where there are no inspection facilities, he or she has evaded inspection. *Matter of Phelisna*, 551 F.Supp. 960 at 962 (E.D.N.Y.1982). The statement that Petitioner hired smugglers to take him to the United States shows that Petitioner had no intention of submitting himself for immigration inspection. *See Matter of G—*, Interim Decision 3215, at 7 (BIA 1993). His conduct confirms this intention to evade inspection. Once helicopters appeared and the authorities directed spotlights onto the Golden Venture, Petitioner did not wait for the rescuers in boats to arrive but left the ship to swim ashore. Thus, the issue remains as to whether Petitioner was free from official restraint.

The BIA concluded: "[T]he applicant has clearly failed to sustain his burden of showing that he was, at any relevant time, free from official restraint." (Lenihan Aff. Ex. 3 at 4). The BIA erred in placing the burden of proof on Petitioner. "[T]he Board was not correct in imposing on petitioner more than the burden of proving that [he] came physically into the United States at some point not in the vicinity of an inspection station." *Application of Phelisna*, 551 F.Supp. 960, 963 (E.D.N.Y.1982). The government is clearly in a better position to prove official restraint than an alien. *See id.* at 964.

The Second Circuit has stated: " 'Freedom from official restraint' means that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. *See United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir.1954);

*Lazarescu v. United States*, 199 F.2d 898, 900 (4th Cir.1952)." *Correa*, 901 F.2d at 1172.[7] Courts have found that "continuous surveillance by immigration authorities can be sufficient to place an alien under official restraint," *United States v. Aguilar*, 883 F.2d 662, 681 (9th Cir.1989), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). *See also Cheng v. Immigration and Naturalization Serv.*, 534 F.2d 1018, 1019 (2d Cir. 1976) (per curiam). The "restraint need not be by immigration officers." *Correa*, 901 F.2d at 1172 (citing *Edmond v. Nelson*, 575 F.Supp. 532, 535 (E.D.La.1983)). Thus, it would appear that radar tracking of the Golden Venture, helicopter surveillance, and cordoning off the beach area adjacent to the grounded ship would constitute official restraint.

Whether Petitioner was free from official restraint depends, however, on whether once Petitioner was physically within the territorial limits of the United States, conditions of official restraint existed continuously until he was taken into custody. Temporary freedom from restraint is sufficient to establish entry. *Correa*, 901 F.2d at 1172 (citing *Matter of V–Q–*, 9 I & N Dec. 78 (BIA 1960) (holding that alien was free from restraint having proceeded 75 to 100 feet beyond the inspection point)); *Cheng*, 534 F.2d at 1019 (holding that petitioners had effected entry, having driven four tenths of a mile into the United States before encountering a border patrol agent). Petitioner need not have been on land in order to effect "entry" into the United States. *Vasilatos*, 209 F.2d at 197; *Lazarescu*, 199 F.2d at 900– 01. *See also Edmond*, 575 F.Supp. at 535 (holding that aliens aboard a ship who were met at shore by INS officials had not effected entry because, while aboard, they had been "at all times, under lock and key detention by the ship's master.").[8] Since the IJ

---

7. In *Vasilatos*, 209 F.2d at 197, the court held that an alien who remained aboard a ship in port made entry after an immigration officer had boarded the ship and granted the alien temporary admission into the United States. The court in *Lazarescu*, 199 F.2d at 900–01, reached the same conclusion on identical facts, noting that "[t]he port and harbor of Baltimore is territory of the United States. Entry into that territory even

in a vessel amounted to ['entry'] . . . unless appellant was under restraint which prevented his departing from the vessel. When he accepted admission . . . this restraint was no longer operative. . . . "

8. An alien, however, does not necessarily effect "entry" merely by crossing into the territorial

and BIA improperly placed the burden of proof on Petitioner to show that he was not under official restraint, this matter is remanded for findings relevant to the conditions of official restraint prior to Petitioner's apprehension on the Rockaway Beach.

## CONCLUSION

BIA erred in failing to apply the January 1993 Rule's interpretation of "refugee" under 8 U.S.C. 1101(a)(42)(A). In addition, the BIA erred in placing the burden on Petitioner to prove that he was free from official restraint after crossing the territorial limits of the United States. The BIA's decisions are therefore remanded for proceedings not inconsistent with this Opinion.

**IT IS SO ORDERED.**

waters of the United States with an intent to evade inspection. Section 1321(a) of 8 U.S.C. provides:

> It shall be the duty of every person, including the owners, masters, officers and agents of vessels ... bringing an alien to, or providing a means for an alien to come to, the United States ... to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

Thus, an alien passenger aboard a vessel is under the restraint of the master and officers aboard who have a legal duty to bring the alien to immigration officials. Such restraint is sufficient to satisfy the definition of official restraint. *See Correa*, 901 F.2d at 1172 (citing *Edmond*, 575 F.Supp. at 535).