**Sing Chou CHUNG (A–72–761–978), Petitioner,**

v.

**Janet RENO, Attorney General of the United States, et al., Respondents.**

Civ. A. No. 1:CV–93–1702.

United States District Court,
M.D. Pennsylvania.

May 16, 1995.

Ann Carr, Lancaster, PA, for petitioner.

Robert R. Long, Jr., Asst. U.S. Atty., Lewisburg, PA, Lauri Stephen Filppu, Philemina McNeill Jones, Office of Immigration Litigation, Washington, DC, for respondent George Maugans.

Robert R. Long, Jr., Asst. U.S. Atty., Lewisburg, PA, Lauri Stephen Filppu, Philemina McNeill Jones, Office of Immigration Litigation, Alexander H. Shapiro, Dept. of Justice, Civ. Div., Washington, DC, for respondent David L. Milhollen.

Lauri Stephen Filppu, Philemina McNeill Jones, Office of Immigration Litigation, Alexander H. Shapiro, Dept. of Justice, Civ. Div., Washington, DC, for respondent J. Scott Blackman.

Lauri Stephen Filppu, Philemina McNeill Jones, Office of Immigration Litigation,

Washington, DC, for respondents Richard J. Sharkey et al.

Joseph J. Terz, Harrisburg, PA, Robert R. Long, Jr., Asst. U.S. Atty., Lewisburg, PA, Kristin A. Cabral, John J. Andre, Norah Ascoli Schwartz, David M. McConnell, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondents.

### MEMORANDUM

RAMBO, Chief Judge.

Before the court is the habeas petition of Sing Chou Chung, a citizen of the People's Republic of China. Petitioner Chung has filed a motion for partial summary judgment on the narrow issue of whether he "entered" the United States within the meaning of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101(a)(13). Briefs have been filed on both sides and the motion is ripe for disposition.

### I. *Background*

The instant action arises out of the detention and attempted exclusion by the Immigration and Naturalization Service ("INS") of certain Chinese citizens. The alien at issue was among those arrested and detained after the grounding of the *Golden Venture* in New York Harbor in June 1993. Of the approximately 300 aliens on the vessel when it ran aground, nearly half were subsequently transferred to the York County Prison, a facility located in the Middle District of Pennsylvania. Petitioner Chung was one among many of the detainees who filed a claim for asylum. At the prison, exclusion proceedings under 8 U.S.C. § 1226(a) were instituted against the detainees, including Petitioner. He moved to terminate the exclusion proceedings on the ground that he had "entered" the United States and was therefore entitled to a deportation hearing pursuant to 8 U.S.C. § 1252. (Administrative Record ("A.R.") at 350–60.) The immigration judge ("IJ") denied the motion in a one sentence order, (A.R. at 355), and Chung appealed the decision to the Board of Immi-

gration Appeals ("BIA"). (A.R. at 167–69.) On January 13, 1994, the Board affirmed the IJ's determination that Chung had not entered the United States and was thus appropriately placed in exclusion proceedings. (A.R. at 12.) It is that issue which is presently before the court on appeal.

In *Matter of G–*, Int.Dec. 3215, at 5–7 (BIA 1993), the BIA announced its general findings of fact regarding the arrival of the *Golden Venture*. In disposing of Petitioner's appeal on the entry issue, the Board relied upon that statement of facts, (A.R. at 12), and thus the court will set forth portions of it in some detail.

> The grounding took place 100 to 200 yards offshore of the Fort Tilden military reservation located on the Rockaway Peninsula in the Gateway National Recreation Area of Queens, New York.
>
> According to the record, at about 1:45 a.m. on that Sunday, two officers of the United States Department of Interior Park Police were patrolling the Gateway National Recreation Area when they observed the distressed ship and a number of its passengers swimming in the water or running on the beach. The officers spotted life preservers bobbing in the water and heard people yelling.[1] At 1:58 a.m., the officers placed an emergency call for help to the New York City Police Department and other authorities and then proceeded to assist several of the ship's passengers out of the water.
>
> The Coast Guard dispatched boats and helicopters to the scene of the reported ship wreck to observe and rescue persons aboard the disabled vessel.

*Matter of G–*, Int.Dec. 3215, at 5. At approximately 2:19 a.m., officers from the New York City Police Department arrived on the beach, and along with the Park Police and the Coast Guard, waded into the water to help people to shore. *Id.*

> During these early morning hours, a portion of the Fort Tilden beach—about ¼- to ½-mile-long and extending 600 yards inland from the water line—was ultimately

---

1. "The record indicates the Coast Guard had been monitoring the ship the previous night as it neared the coast. When vessels were dispatched

to intercept it, however, the ship disappeared." *Matter of G–*, Int.Dec. 3215, at 5 n. 5 (footnote in original).

cordoned off and controlled by enforcement officers of these various organizations to prevent passengers who reached shore from leaving the area.

According to newspaper accounts of several passengers interviewed, pandemonium erupted on board when the ship grounded. Passengers began spewing out of the cargo hold of the ship, where they had been forced to stay during their 3–month–long voyage. They crowded the ship's deck, only to be told by the ship's crew to jump overboard.

Over the next hours as rescue personnel assembled in the area, about 200 passengers fled the ship by leaping blindly into the surf or descending a ladder on the side of the boat. Ignoring police and Coast Guard pleas to remain on the vessel, many swam and waded to shore clutching plastic bags of belongings while others used plastic jugs as makeshift floats.

An armada of small vessels, rafts, and cutters fished many of these 200 out of the 53–degree waters and brought them to shore.[2] Other passengers managed to reach dry land on their own only to be apprehended on the beach or within the perimeter of the cordoned-off area. Many of the ship's occupants who swam to shore suffered from hypothermia and simply collapsed on reaching the beach. A few, however, eluded capture by fleeing through the thick-brushed dunes into the surrounding neighborhoods.

. . . .

More than 100 passengers, however, remained on board and awaited the arrival of rescue personnel.

. . . .

By the evening of June 6, 1993, 273 of the 300 passengers reported to have been aboard the vessel had been accounted for while some 30 remained at large. Law enforcement authorities took the captain of the freighter and his crew of 12 off the ship and arrested them pending criminal prosecution on smuggling charges.[3]

*Id.* at 6–7.

Petitioner Chung was among the passengers who jumped overboard and swam to shore. (A.R. at 391.) Upon reaching shore, he collapsed from exhaustion (probably hypothermia[4]). *Id.* He lay on the beach for approximately 30 minutes before being approached by someone in a uniform, who wrapped a blanket around him. *Id.* Chung was later examined by medical personnel on the beach, transported to a hospital by police, and detained at a Red Cross facility pending immigration processing. (A.R. at 391–92.)

## II. Standard of Review

■ Factual determinations by the Board will be upheld "if supported by reasonable, substantial, and probative evidence on the record considered as a whole. . . ." 8 U.S.C. § 1105a(a)(4). To reverse a factual finding by the Board, the court must not only find that the evidence supports a contrary conclusion, but that it compels one. *Immigration and Naturalization Service v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992). Issues of law are reviewed *de novo. Sotelo–Aquije v. Slattery,* 17 F.3d 33, 35 (2nd Cir.1994). However, the court should defer to reasonable BIA interpretations of the INA. *Fatin v. INS,* 12 F.3d 1233, 1239 (3rd Cir.1993).

## III. Entry

■ An alien is entitled to deportation rather than exclusion proceedings only if he or she "entered" the United States within the meaning of the INA. The advantages of deportation proceedings are significant. The Second Circuit has noted:

rate multimillion-dollar smuggling operation. Many passengers paid more than $20,000 or agreed to pay off a portion of the fee by agreeing to be indentured servants in this country." *Id.* at 7 (footnote in original).

---

**2.** "The Coast Guard recovered the bodies of four passengers who had drowned in the choppy waters. Three other passengers plucked from the 53–degree waters died later." *Id.* at 6 (footnote in original).

**3.** "According to newspaper accounts, the *Golden Venture* sailed from Thailand with its cargo of illegal Chinese immigrants as part of an elabo-

**4.** *See id.* at 6.

Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, and the right to designate the country of destination [if the alien is ultimately deported].

*Correa v. Thornburgh,* 901 F.2d 1166, 1171 n. 5 (2nd Cir.1990). The INA defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise...." 8 U.S.C. § 1101(a)(13). Over the years, courts have given more specific content to the meaning of entry, and have settled on the following three part definition:

(1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

*Correa,* 901 F.2d at 1171 n. 5 (quoting *Matter of Pierre,* Int.Dec. 2238 (BIA 1973), 1973 WL 29484 at *2; *Matter of Ching and Chen,* Int.Dec. 2984, at 3 (BIA 1984)). The BIA applied this definition to Petitioner's claim and concluded that he did not accomplish entry because, despite having satisfied the first two prongs, he was never free from official restraint.

### A. Crossing Into United States Territory

█ United States territory extends three miles seaward from the coast. *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 209, 106 S.Ct. 2485, 2487, 91 L.Ed.2d 174 (1985); *United States v. Chaparro–Almeida,* 679 F.2d 423, 426 n. 9 (5th Cir.1982). With respect to the entry issue, the Third Circuit has expressly held that an alien crosses into United States territory when he or she reaches our territorial waters. *United States v. Vasilatos,* 209 F.2d 195, 197 (3rd Cir.1954); *see Lazarescu v. United States,* 199 F.2d 898, 900 (4th Cir.1952); *Xin–Chang v. Slattery,* 859 F.Supp. 708, 713 (S.D.N.Y. 1994); *In Re Dubbiosi,* 191 F.Supp. 65, 66

(E.D.Va.1961). Thus, it is undisputed that the passengers aboard the *Golden Venture* crossed into the territorial limits of the United States.

### B. Intentional Evasion Of Inspection

█ Evasion of inspection is the act of intentionally turning away from the ordinary route to the nearest point of inspection, or otherwise seeking to circumvent the normal inspection process. *Cheng v. INS,* 534 F.2d 1018 (2nd Cir.1976); *Matter of Pierre,* Int. Dec. 2238 (BIA 1973), 1973 WL 29484 at *3 (citing cases); *Matter of Estrada–Betancourt,* Int.Dec. 1725 (BIA 1967), 1967 WL 13992 at *3–4. Evasion has been achieved when an individual crosses a border where there are no inspection facilities without the intent to submit to inspection. *Xin–Chang,* 859 F.Supp. at 714 (citing *Matter of Phelisna,* 551 F.Supp. 960, 962 (E.D.N.Y.1982)).

█ The intent to evade inspection may be established by the circumstances surrounding an alien's physical entry, even "absent a statement by the alien and ... in the face of his contrary testimony." *Matter of G–,* Int.Dec. 3215, at 14 n. 10 (citing *Matter of Z–,* Int.Dec. 3208, (BIA 1993)); *see Matter of Estrada–Betancourt,* Int.Dec. 1725, 1967 WL 13992 at *3–4. Courts have specifically held that an intent to evade inspection may be deduced from the fact that an alien sought to enter the United States with the assistance of smugglers. *See Cheng* 534 F.2d at 1019 (finding "overwhelming" evidence of intent to evade inspection when aliens entered United States from Canada hidden in a van at 3:00 a.m., without headlights, turned away from the nearest inspection point, and where the driver had surreptitiously entered the United States in like manner a week prior); *Xin–Chang,* 859 F.Supp. at 714 (fact that *Golden Venture* passenger hired smugglers to transport him to United States showed intent to evade inspection); *Matter of Z–,* Int.Dec. 3208 (BIA 1993), 1993 WL 424164 at *2–5 (fact that Chinese alien was smuggled into United States by boat pointed to intent to evade inspection); *Matter of G–,* Int.Dec.

3215, at 13 & n. 9.[5] Furthermore, an alien may have the requisite intent to evade inspection at the time of entry even if she plans to present herself for inspection somewhere other than at the nearest inspection point. *Matter of G–*, Int.Dec. 3215, at 13–14 (citing *Matter of Estrada–Betancourt*, Int. Dec. 1725); *see also United States v. Kavazanjian*, 623 F.2d 730, 739 n. 19 (1st Cir. 1980) (aliens who illegally fled American airport and subsequently applied for asylum effected entry, "for even a temporary evasion of the inspection process suffices to produce an entry").

The BIA concluded that Petitioner met the second part of the entry test by actually and intentionally evading inspection at the nearest inspection point. (A.R. at 12 n. 5.) Although the government has challenged this determination, in light of the standards set forth the court believes that the BIA's resolution of the issue is correct. The court will not disturb it.

## C. *Freedom From Official Restraint*

The third and final prong of entry is that Petitioner must have been "free from official restraint" after crossing into the United States with an intent to evade inspection. It is this element of entry that the BIA found lacking in Petitioner's claim. Both the BIA and the government appear to believe that Petitioner failed to satisfy the requirement because it is not clear from the record whether he reached dry land before official restraint came into existence.

### 1. *General Standards*

■■■ The Second Circuit has stated: " 'Freedom from official restraint' means that the alien who is attempting entry is no longer under constraint *emanating from the government* that would otherwise prevent her from

physically passing on." *Correa*, 901 F.2d at 1172 (emphasis added); *Matter of Patel*, Int. Dec. 3157 (BIA 1991), 1991 WL 353524 at *6 (adopting this formulation of official restraint). While movement is evidence of freedom from official restraint, it is not a precondition to it. "The critical point ... is that freedom from official restraint exists, not that such freedom has been exercised." *Matter of Patel*, Int.Dec. 3157, 1991 WL 353524 at *5; *see Correa*, 901 F.2d at 1172 (citing *Vasilatos* and *Lazarescu*, *supra*, holding that aliens on ship were free from official restraint despite never having disembarked in United States territorial waters); *United States v. Aguilar*, 883 F.2d 662, 683 (9th Cir.1989), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991) ("where an alien is able to exercise his free will subsequent to physical entry, he is not under official restraint"); *Cheng*, 534 F.2d at 1019 (aliens confined to moving van were free from official restraint); *Matter of Z–*, Int. Dec. 3208, 1993 WL 424164 at *7 (alien smuggled by ship was free from official restraint despite remaining in allegedly guarded debarkment area, because escape of fellow passengers demonstrated that he could have exercised freedom to depart). Furthermore, only brief freedom from restraint is necessary in order to accomplish entry. *See Correa*, 901 F.2d at 1172 (discussing *Matter of Q–V–*, 9 I & N Dec. 78 (BIA 1960), in which alien entered by proceeding just 75 to 100 feet beyond inspection point, and inspector lost custody of alien); *United States v. Martin–Plascencia*, 532 F.2d 1316, 1317–18 (9th Cir.1976) (alien entered by traveling only 50 yards into United States before being subject to official restraint); *Cheng*, 534 F.2d at 1019 (aliens entered by traveling only two-fifths of a mile into United States before being subject to official restraint).[6]

---

5. In *Matter of G–*, the BIA weighed the following facts when considering whether a *Golden Venture* passenger intended to evade inspection: (1) the vessel did not arrive at an inspection station; (2) once the ship grounded the captain and crew encouraged the passengers to jump overboard and flee rather than restricting them to the ship pending immigration clearance; (3) the captain did not place a distress call when the boat ran aground; (4) many of the passengers carried their possessions in plastic bags, as if prepared to swim; (5) the applicant's payment of money to a

smuggling operation for transportation to the United States; (6) the applicant's lack of travel documents qualifying him for entry; and (7) the applicants attempt to flee. *Matter of G–*, Int.Dec. 3215, at 13 & n. 9. The BIA concluded that these circumstances clearly demonstrate an intent to evade inspection.

6. The BIA has suggested that one is not free from official restraint if she "lacks the freedom to go at large and mix with the population." *Matter of Pierre*, Int.Dec. 2238, 1973 WL 29484 at *2. No

Official restraint need not be actual physical restraint. "Courts have found that 'continuous surveillance by the immigration authorities can be sufficient to place an alien under official restraint....'" *Xin–Chang v. Slattery,* 859 F.Supp. at 714 (quoting *Aguilar,* 883 F.2d at 681); *see also Cheng* 534 F.2d at 1019. Furthermore, the individual exercising official restraint need not be a government official, provided that he or she is acting pursuant to governmental law or regulation. *Correa,* 901 F.2d at 1172 (citing *Edmond v. Nelson,* 575 F.Supp. 532, 535 (E.D.La.1983), holding that official restraint was achieved by ship's master who delivered aliens to INS officials as required by law). Accordingly, even if an alien is not subject to actual physical restraint by a government official, he or she may be "constructively" or "effectively" subject to restraint emanating from the government.

## 2. *Freedom From Official Restraint In United States Territorial Waters*

The Third Circuit, in *U.S. v. Vasilatos,* addressed the application of entry requirements to an alien who crossed into American territorial waters. The *Vasilatos* court concluded that an alien may be free from official restraint without reaching dry land.

The alien at issue in *Vasilatos* arrived in the United States as a crew member aboard a Greek ship coming from abroad. The ship's first port of call was Philadelphia. At Philadelphia, an INS officer boarded the ship and interviewed each alien crew member to determine whether he or she would be granted temporary admission, or would be required to remain on board the ship while in the United States. Vasilatos falsely represented to the INS officer that he had not previously been deported from the United States, and, as a result, the officer granted him temporary admission. However, Vasilatos remained continuously on board the ship during its stay in Philadelphia, and did not disembark until it reached Baltimore. *Vasilatos,* 209 F.2d at 197. The issue before the Third Circuit was whether Vasilatos "en-

tered" the United States in Philadelphia, or not until touching dry land in Baltimore, within the meaning of 8 U.S.C. § 1101(a)(13).

The *Vasilatos* court found that the alien was present in the United States, despite having never left the ship, while at the port of Philadelphia. It stated that the "presence in the United States which is essential to entry existed when, *and even before,* the ship arrived in Philadelphia. No landing was necessary to supply that prerequisite." *Vasilatos,* 209 F.2d at 197 (emphasis added). The court emphasized, however, that physical presence in American territorial waters is not sufficient, in itself, to amount to entry. The court explained:

It must have been apparent, long before the fact was emphasized in the 1952 definition, that in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation. But the actual clearance of persons who seek admission in regular course is accomplished at designated stations, many of them located as a matter of convenience some distance inside the national boundary. In these circumstances, those who have come from abroad directly to such station seeking admission in regular course have not been viewed by the courts as accomplishing an entry by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission.... The reasonableness of this concept is emphasized by the fact that the master of an incoming vessel is under a legal duty to restrict passengers and crew members to the ship pending immigration clearance.... In any event, the view has prevailed with respect to arrivals of the type here involved that freedom from official restraint must be added to physical presence before entry is accomplished.

*Id.*

The Third Circuit thus offered two explanations for why an alien who crosses into

federal court has adopted this formulation as a prerequisite to freedom from official restraint, and one appears to have expressly rejected it. *See Martin–Plascencia,* 532 F.2d at 1318

("Whether or not ... [the alien] was ultimately able to run the obstacle course and reach the streets of San Ysidro is beside the point.")

American territorial waters does not necessarily "enter" the country within the meaning of the INA. First, the court observed that it is not possible for ships to reach an inspection station without first crossing into United States territory. If physical presence alone amounted to entry, it would have the preposterous result that aliens traveling to the United States by boat could not reach an inspection station, where clearance for admission must be obtained, without already having committed illegal entry. The court thus concluded that aliens who cross into United States territorial waters and proceed "*directly* to ... [an inspection] station seeking admission *in regular course* ..." have not necessarily entered the United States. *Id.* (emphasis added). Second, the court reasoned that merely crossing into American territorial waters does not accomplish entry because "freedom from official restraint must be added to physical presence before an entry is accomplished." *Id.* And, the court stated, persons aboard a ship are under official restraint because "the master of an incoming vessel is under a legal duty to restrict passengers and crew members to the ship pending immigration clearance." [7] *Id.* (citing 8 U.S.C. § 1321).[8]

---

**7.** The court notes the use of "incoming" because it suggests the need for official restraint prior to the boat reaching harbor.

**8.** 8 U.S.C. § 1321(a) states, in pertinent part:
It shall be the duty of every person, including the owners, masters, officers, and agents of vessels ... bringing an alien to, or providing means for an alien to come to, the United States ... to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

**9.** The government never addresses the implications of *Vasilatos* for Petitioner's claim, despite his reliance upon it. It does, however, respond to Petitioner's reliance upon *Lazarescu*, 199 F.2d at 900–01, which reached the same conclusion as *Vasilatos* on virtually identical facts. The court will thus presume that the government's view of the two cases is the same. It argues for an extremely narrow reading of these cases, limiting their significance to circumstances in which an alien has been granted admission. (Respondents' brief at 19.) It disregards *Vasilatos'* reliance upon § 1321, and appears to maintain that absent a grant of admission, it is not possible to be free from official restraint without reaching

Having set forth these principles, the *Vasilatos* court concluded that the alien at issue had entered the United States while in Philadelphia. The court found that once he succeeded in obtaining clearance from the INS officer for a temporary stay, albeit fraudulently, he was free from official restraint. *Id.* When this freedom from official restraint was coupled with the alien's physical presence in the United States, the alien accomplished entry in Philadelphia despite never having set foot on dry land. *Id.*

This court reads *Vasilatos* to have found that the ship's master, acting pursuant to § 1321, was the source of official restraint over the alien prior to the grant of admission. This reliance upon § 1321 suggests that it is possible for an alien to be free from official restraint in American territorial waters even without a grant of admission.[9]

The court finds substantial support in the case law for its reading of *Vasilatos*. In reference to *Vasilatos* and *Lazarescu*, one member of the BIA has noted:

It is clear from the analysis provided in these two decisions that the "restraint" the courts were referring to was that imposed

dry land. Although this proposition is central to the government's argument on the entry issue, it is never expressly stated. Nevertheless, it is implicit in the government's analysis of the facts in Petitioner's record pertaining to entry. In summarizing the evidence on the issue of freedom from official restraint, the government states:

Petitioner made no showing to the IJ or Board that he arrived *on land* before law enforcement personnel [which supplied official restraint] were in place.... The Board's findings are supported by substantial evidence, in that there is nothing in the record which compels a conclusion that Chung had in fact *landed* outside the cordoned area of the beach or land prior to the time the area was cordoned off.

(Respondents' brief at 12.) The government never considers the possibility that Petitioner was free from official restraint *before* he reached land, and the court understands this omission to reflect a belief that he could not have been. Because the government never makes the statement explicitly, it never identifies the authority upon which it relies, and the court can find none which supports the position. As will be discussed below, it is apparent from the BIA's analysis of the *Golden Venture* cases in *Matter of G–*, Int.Dec. 3215, at 8–11, that it labors under the same unarticulated belief.

by the captains of the vessels. They were "under a legal duty to restrict passengers and crew members to the ship," as the court stated in *Vasilatos*.

*Matter of Patel,* Int.Dec. 3157, 1991 WL 353524 at *8 (Heilman, dissenting).[10] Furthermore, a number of federal courts have taken a similar view of the issue. Of these decisions, *Edmond v. Nelson,* 575 F.Supp. 532, (E.D.La.1983), warrants particular attention.

In *Edmond,* the eight petitioners were among twenty-five Haitian citizens who set out by boat from Haiti with the hope of reaching Miami, Florida. While in the Caribbean, they were picked up by a commercial ship destined for New Orleans, Louisiana. During the journey to New Orleans the Haitians were kept under continuous guard, and upon arriving the ship's master notified the INS, which sent immigration officers to inspect the aliens on board the ship. The aliens were ultimately placed in exclusion proceedings, which they challenged as improper on the ground that they had effected "entry" under 8 U.S.C. § 1101(a)(13) before they were turned over to the INS. *Id.* at 533–34. The court rejected the petitioners' claim, finding that although they were present in the United States before being taken into custody, they were never free from official restraint. *Id.* at 535. Like *Vasilatos, Edmond* relied upon 8 U.S.C. § 1321(a), stating: "Because the law requires the ship's master to detain aliens under circumstances like those here, his detention of these aliens does not differ from 'governmental restraint' or 'custody.'" *Id.; see also In Re Dubbiosi,* 191 F.Supp. 65, 66 (E.D.Va.1961) (holding that alien crew member who remained on board ship at Virginia port did not effect entry because he was kept under guard by INS agents and was thus never free from official restraint). This reliance upon the requirement of § 1321 to demonstrate the existence of official restraint in United States territorial waters, where no grant of admis-

sion had issued, would be senseless if freedom from official restraint could not be accomplished without reaching dry land. Thus, the *Edmond* holding necessarily presupposes that an alien can be free from official restraint while in United States territorial waters, despite not having been granted admission by an INS officer.

The holding in *Edmond* has been relied upon by numerous federal courts and the BIA. The court notes, with particular interest, that the BIA cited *Edmond* in a published opinion for the proposition that "'aliens seeking entry by sea [can be] restrained by [the] master of [a] rescuing ship, acting pursuant to governmental regulations.'" *Matter of Patel,* Int.Dec. 3157, 1991 WL 353524 at *6 (quoting *Correa,* 901 F.2d at 1172). *Edmond* has been cited for the same proposition by the Second Circuit in *Correa,* 901 F.2d at 1172, and the Southern District of New York in *Xin–Chang,* 859 F.Supp. at 713.[11] These cases support the court's reading of *Vasilatos.* Finding no contrary authority, the court concludes that aliens not granted admission may be free from official restraint in American territorial waters.

### 3. *BIA's Analysis*

In its analysis of Petitioner's entry claim on appeal, the Board stated:

[T]he applicant represented that he was exhausted by the time he reached the shore, and unable to leave the beach area. His movements were restricted to the immediate vicinity of the beach which we found in *Matter of G–,* Interim Decision 3215 (BIA 1993), was cordoned-off and controlled by enforcement officers of the various governmental organizations there, working to prevent the passengers from absconding. Thus, the applicant was not "free from official restraint."

(A.R. at 12.) Although the BIA's treatment of this issue in Petitioner's case was rather sparse, it set out an extensive analysis of official restraint as it pertains to *Golden*

---

**10.** While this statement occurs in a dissenting opinion, is not in conflict with the majority decision.

**11.** *See also Matter of G–,* Int.Dec. 3251, at 10, 15 n. 11 (relying upon *Edmond* twice in official

restraint analysis); *Gonzalo v. Thornburgh,* 761 F.Supp. 1264, 1265 n. 1 (W.D.La.1991) (citing *Edmond* in support of official restraint requirement).

**1182**

*Venture* passengers in *Matter of G—*, Int.Dec. 3215, at 8–15.[12] The Board stated:

> Viewing the situation in its totality, ... it is clear that some passengers of the *Golden Venture* arrived in the United States free from official restraint, while others did not. ...
>
> For example, although the exact number may never be known, several of the ship's occupants, presumably the first to jump ship, did *reach dry land* before the vessel was spotted by the two Park Police officers who first observed the disabled ship at 1:45 a.m. According to the record, the officers witnessed "numerous" individuals running "to avoid detection." These passengers were clearly free from any official restraint. Similarly, other evidence in the record suggests that several passengers were found, possibly hours later, in neighboring communities. These aliens were not only free from any restraint, but were in fact mixing with the general population.
>
> . . . .
>
> In contrast, for those 100 or more passengers who were escorted off the ship—as well as the many others who were pulled from the water by rescue personnel or who landed in the cordoned-off area after it was secured—we would not find that their physical presence here was coupled with "freedom from official restraint." The movements of these aliens were restricted to the immediate vicinity of the beach cordoned-off by the scores of law enforcement personnel at the scene. These aliens were never free to leave the area. They were never at liberty in the United States, and, under these circumstances, clearly lacked the freedom to go at large and mix with the general population.
>
> . . . .
>
> Thus, some passengers of the *Golden Venture* were clearly in this country free from official restraint, while others were not. However, in circumstances such as those which occurred on the morning of June 6,

1993, the facts of each individual case may never be clearly determinable for various reasons. For one, it could never be definitively established at what precise point the cordoned-off area of the beach at Fort Tilden was finally secured. Second, even if that time theoretically could be established, e.g. at 3:49 a.m., many aliens—even if testifying fully and truthfully—would not know *exactly when they reached shore*. ... Indeed, in many cases, particularly those involving aliens who managed to swim to shore, there likely will never be any certainty as to *exactly when and under what circumstances they made it onto the beach.*

> If aliens can establish the specific circumstances of their arrivals, their cases can be resolved on the facts. For example, if an alien can show that he was one of the first passengers to disembark the ship and *reach shore,* or that he managed to arrive at a neighboring town, freedom from official restraint would be found.

*Id.* at 8–11 (emphasis added).

The Board's analysis of freedom from official restraint traces the following path. The *Golden Venture* passengers who "did reach dry land before the vessel was spotted by the two Park Police officers ... were clearly free from any official restraint." *Matter of G—*, Int.Dec. 3215, at 9. Conversely, "those 100 or more passengers who were escorted off the ship ... as well as the many others who were pulled from the water ... or who landed in the cordoned-off area after it was secured ..." were never free from official restraint. *Id.* Consequently, the crucial evidentiary issue under the Board's reasoning is "exactly when they reached shore." *Id.* at 10.

The necessary and unstated premise in the BIA's analysis, like the government's, is that an alien must touch dry land before he or she can achieve freedom from official restraint. The Board offers neither authority nor ratio-

---

12. In *Matter of G—* the BIA applies its entry analysis to numerous categories of passengers rather than limiting discussion to the applicant before the Board. It appears to do so with the intent of offering guidance as to its reasoning on the entry issue in all the *Golden Venture* cases. Because the Board's treatment of the issue in Petitioner Chung's case is so limited, the court will look to *Matter of G—* to determine the rational for its decision.

nale for the premise.[13] Every court, including the Third Circuit, to consider whether an alien effected entry while in our territorial waters has indicated that it is possible to be free from official restraint without reaching an American shore. *See supra* section III.2. Accordingly, the court must reject the Board's view of freedom from official restraint in favor of the standards adopted by the Third Circuit and other federal courts.

### 4. *Application Of Appropriate Standards*

 Both the BIA and government appear to recognize, at least implicitly, that the passengers aboard the *Golden Venture* were not maintained under official restraint by the ship's master or officers. The BIA expressly identifies the *Golden Venture* as a smuggling ship, *Matter of G–,* Int.Dec. 3215, at 13 & n. 9, and the government has concurred in that judgment throughout this litigation. This view is supported by the fact that authorities took the ship's captain and crew of 12 off the vessel and arrested them pending criminal prosecution on smuggling charges. *Matter of G–,* Int.Dec. 2315, at 7. Clearly, then, it was the specific intent of the ship's master and officers to violate their duty, pursuant 8 U.S.C. § 1321, to deliver the aliens on board to a port of inspection specified by immigration officials.

In the absence of official restraint exercised by the ship's master or officers, the court must consider what other sources of

official restraint are suggested by the facts. The record indicates that the *Golden Venture* was first spotted, grounded one to two hundred yards off Rockaway beach, by two Park Police officers at 1:45 a.m. *Id.* at 5. This is the earliest possible point in time that the ship's passengers were arguably subject to any form of restraint emanating from the government.[14] At this moment, "[a]ccording to the record, the officers witnessed 'numerous' individuals running [along the beach] 'to avoid detection.'" *Id.* at 9. Consequently, it is evident that prior to the existence of official restraint the vessel was grounded for at least sufficient time for "numerous" passengers to swim one to two hundred yards, emerge from the water, and begin running down the beach.

The Board acknowledges, correctly, that the individuals already on the beach at the time of the sighting were free from official restraint. *Id.* In light of this court's rejection of the principle that one can only be free from official restraint on dry land, it must also reject the Board's distinction between those passengers swimming or wading toward shore and those running along the beach when the vessel was spotted. The court can conceive of no rational ground for concluding that the persons in the water were subject to *official* restraint, prior to any actual or constructive official awareness of their existence, while at the same moment those on land were not. In the dark of night

---

**13.** The closest the Board comes to acknowledging this core issue occurs in a footnote, when it states:

> Similar cases can be found involving Haitians who arrived by private or makeshift boats at uncontrolled beaches having no immigration inspection facilities in southern Florida, made their way on land, and, shortly thereafter, were taken into official custody and ultimately processed in exclusion proceedings. *See, e.g., Bertrand v. Sava,* 684 F.2d 204 (2nd Cir.1982). We also note that it has never been held that the mere crossing into the territorial waters of the United States, whether detected or undetected, constitutes "physical presence" in this country "free from restraint." *Matter of G–,* Int.Dec. 3215, at 10 n. 5.

However, the Board's reliance upon *Bertrand* is misplaced because that court never addressed the entry issue, let alone the matter of freedom from official restraint. As for the Board's second statement, it is self-evident. The "mere cross-

ing" into the United States, whether through territorial waters or overland, does not constitute "physical presence" in this country "free from *official* restraint" (the court notes the BIA's telling omission of "official.") "Physical presence," whether on land or in territorial waters, is only one element of entry, while freedom from official restraint and evasion of inspection are separate and distinct elements.

**14.** The record indicates that the Coast Guard did not have the *Golden Venture* under surveillance when it entered United States territorial waters, and that the sighting by the Park Police was the first official awareness of the ship's presence in this country. *Matter of G–,* Int.Dec. 3215, at 5 & n. 2. Moreover, it is unlikely that official restraint actually existed immediately upon the spotting of the ship; the BIA appears to believe that it did not arise until the beach was cordoned off. *Id.* at 9. Whatever the case, it could not have occurred prior to some official awareness of the ship.

these men and women jumped ship into rough, 53–degree waters, where some perished. The court can scarcely imagine a more profound exercise of freedom from official restraint.[15] *See Correa,* 901 F.2d at 1172; *Aguilar,* 883 F.2d at 683; *Martin–Plascencia,* 532 F.2d 1316; *Matter of Patel,* Int.Dec. 3157, 1991 WL 353524 at *5.

 While the record demonstrates that Petitioner Chung was among the passengers to jump ship, it is not apparent if he did so before or after official restraint had arisen. Therefore, the court must consider whether individuals on board the ship when it was first observed, like those on the beach and in the water at the same time, were free from official restraint. Courts have unanimously held that the material inquiry here is whether freedom from official restraint existed, not whether it was affirmatively exercised. *See Correa,* 901 F.2d at 1172; *Aguilar,* 883 F.2d at 683; *Matter of Z–,* Int.Dec. 3208, 1993 WL 424164 at *7; *Matter of Patel,* Int.Dec. 3157, 1991 WL 353524 at *5. The duration of the opportunity need not be lengthy. *Correa,* 901 F.2d at 1172 (discussing *Matter of Q–V–,* 9 I & N Dec. 78); *Martin–Plascencia,* 532 F.2d at 1317–18; *Cheng,* 534 F.2d at 1019; *Xin–Chang,* 859 F.Supp. at 714. When the *Golden Venture* ran aground, the crew unlocked the cargo hold and its passengers moved out onto the

deck. *Matter of G–,* Int.Dec. 2315, at 6, 13 n. 9. Not only was there an absence of official restraint, but it appears that the crew actually instructed the passengers to jump overboard and flee. *Id.* Petitioner Chung's record nowhere indicates that he was ever restrained, officially or otherwise, from jumping ship after the grounding, nor does the government or the BIA claim that he was. Therefore, regardless of whether official restraint existed when Chung jumped overboard, it is not disputed that he had the opportunity to do so before such restraint arose. This opportunity to choose amounts to freedom from official restraint, regardless of when or even if it was exercised.[16]

### 5. *Appropriate Remedy*

 When a court determines that the BIA has applied the wrong legal standard, the appropriate remedy is generally to remand for proceedings not inconsistent with the court's opinion. *Tarvand v. INS,* 937 F.2d 973, 977 (4th Cir.1991) (citing *Doe v. INS,* 867 F.2d 285, 290–91 (6th Cir.1989)). However, if the administrative record is fully developed[17], the underlying law and facts permit only one determination such that remand would serve no useful purpose[18], and under the circumstances further delay would be unjust[19], the court has the authority to

---

15. The BIA suggests that these perilous conditions actually militate *against* finding freedom from official restraint. The Board indicates that such freedom was not achieved by most of the aliens, including many who jumped overboard, because the ship grounded "100 or more yards off shore with passengers facing a hazardous (indeed, fatal for some) journey to land...." *Matter of G–,* Int.Dec. 3215, at 10 n. 5. This remark implies that if the water was warm, placid and shallow, the Board's official restraint analysis might have been different (the Board's only allusion to the possibility of freedom from official restraint without reaching land). Weather conditions, however, do not emanate from the government, and thus cannot serve as its proxy for official restraint purposes. Perhaps more important, approximately 200 of the passengers *did* exercise their freedom from whatever restraint the hazardous conditions created by jumping ship. The fact that some jumped to their death underscores the gravity of the choice which they faced. For the Board to imply that the deaths evidence a lack of freedom, notwithstanding the fact that fully two-thirds of the passengers took the risk, is misguided.

16. Two courts have found that *Golden Venture* passengers did not enter the United States because they were never free from official restraint. *See Chai v. Carroll,* 48 F.3rd 1331, 1343 (4th Cir.1995); *Chen v. Carroll,* 858 F.Supp. 569, 573 (E.D.Va.1994). Because neither court discussed the law relied upon in reaching that conclusion, this court will not attempt to account for the decisions.

17. *See Podedworny v. Harris,* 745 F.2d 210, 224 (3rd Cir.1984) (Adams, J., concurring); *Rivera v. Sullivan,* 923 F.2d 964, 970 (2nd Cir.1991).

18. *See Podedworny,* 745 F.2d at 224 (Adams, J., concurring); *Saballo–Cortez,* 761 F.2d 1259, 1266 (9th Cir.1985) (quoting *McMullen v. INS,* 658 F.2d 1312, 1318 (9th Cir.1981)); Kenneth Culp Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 18.1 (3rd ed. 1994).

19. *See Rivera,* 923 F.2d at 970; Davis and Pierce, *supra,* § 18.1.

reverse rather than remand. The court believes that in the present case all three requirements are easily met. The extremely thorough factual findings set forth in *Matter of G–*, Int.Dec. 3215, and incorporated by reference in the BIA's disposition of Petitioner's appeal, provide all the information necessary to resolve the entry issue. In the court's view, application of the appropriate legal standards to the record *necessarily* requires the conclusion that Petitioner entered the United States. Finally, considering Petitioner's nearly two year imprisonment, the court believes that it would be substantially unjust to consume more time disposing of the entry issue. Instead, in light of the court's determination that Petitioner entered the United States, it will order that he be granted a deportation proceeding.

## IV. Burden Of Proof

Petitioner claims that the BIA erred as a matter of law in placing the burden of proof on him as to each of the three elements of entry. Having determined that he entered the United States, the court need not reach the burden of proof question. However, because the court's ruling on entry may be appealed, it could ultimately become necessary for the court to address the proper allocation of the burden in adjudicating entry. In view of Petitioner's lengthy detention, the court will decide the burden of proof issue at this juncture so as to avoid unnecessary delay.

The INA provides: "Whenever any person makes application … for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is … not subject to exclusion under any provision of this act." 8 U.S.C. § 1361. The Act defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise …." 8 U.S.C. § 1101(a)(13). Petitioner maintains that §§ 1361 and 1101(a)(13) should be read to require proof

only of physical entry into the United States at a point distant from an inspection station. The government and the BIA contend that under § 1361 an alien carries the more onerous burden of proving all three elements which courts have interpreted entry to require.

The only two courts to expressly address the issue have held that the Board erred by imposing a burden on the petitioner beyond proving that he "came physically into the United States at some point not in the vicinity of an inspection station." [20] *Application of Phelisna*, 551 F.Supp. 960, 963 (E.D.N.Y. 1982); *Xin–Chang*, 859 F.Supp. at 714 (quoting *Phelisna* ). This court believes that the approach of *Phelisna* and *Xin–Chang* does justice to the congressional intent underlying § 1361 while maintaining a rational and fair allocation of the burden with respect to aspects of entry developed by the courts. Accordingly, the court concludes that the BIA erred in placing the burden on Petitioner to show more than that he physically entered the United States at a point distant from an inspection station.

## V. Conclusion

The court concludes that Petitioner entered the United States within the meaning of 8 U.S.C. § 1101(a)(13) and is therefore entitled to a deportation proceeding. An appropriate order will be issued.

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1) Petitioner Sing Chou Chung's motion for partial summary judgment on the narrow issue of whether Petitioner "entered" the United States within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13), is **GRANTED,** and Petitioner is therefore entitled to a deportation proceeding.

**20.** The government cites *Correa*, 901 F.2d at 1172, and *Chen v. Carroll*, 858 F.Supp. 569, 573 (E.D.Va.1994), as supporting the Board's placement of the burden on Petitioner as to all three judicially elaborated elements of entry. These cases merely state that the alien failed to satisfy an element of entry, and there is no indication that the petitioner in either case challenged the Board's allocation of the burden.

2) The captioned action as it pertains to Petitioner Sing Chou Chung (A–72–761–978) is remanded to the BIA for appropriate deportation proceedings.