You Yi YANG; Bong Won Yee; Guang Feng Li; Chu–Su Chen; Pin Lin; Yong Zhong Pan, a/k/a Pu Wing Chun; So Gee Dong; Chang Chun Lu; Xin–Fei Zhang, a/k/a Xin–Fuei Zarang; Tong Wai Zhang; Dai Min Lu; Shi Chun Zheng; Chun Hua Lin; Xing Chen; Shuidi Zheng; Guo Zhen Xie; Li Yun–You; Ming Long Lin; Dek Fun Lin; Zhong Chen; Wang Chao Lin; Nan Ren Lin; Yeng Ming Lin; Chan Bin Jong; Zeng Hua Zheng; Yung Kwon Cheng; Rui Qui Huang; Shimu Chen; Gui Lin Cheng; Ren Yan Yang; Yong Zheng; Kwai Sung Cheng; Xue Kian Chen; Yi Hong Lin; Gou Zhi Lee; Jian Le Shi; Wu Chao; Xing–Kwong Zheng, a/k/a Xing–Ke Zheng; Xue Yao Lin; Jian Bin Lin; Wing Jong Jung; Bin Hua Zheng; Xiang Gui Cao; Zuoxun Lee; Chai Kan Cheng; Ai Ming Wang; Sing Chou Chung; Jar Jian Wang; He Ping Cao; Zeng–Ping Lui; Kou Zhang Cheng; Gong Shi; Cai Wan Chen; Yue Feng Lee; Zhao Shan Zhao; Fen–Hou Chen; Chong Sheng Qu; Xue–Dee Chen; Mao–Jiang Lin; Wen–Hao Chen; Jian Fu Chai; De Hui Chen; Ji Li Zheng; Fu Sing Zheng; Ye Zing Chai; Fa Yu Zhuang; Shi J Zheng; Zhong Zhou; Lian Bing Zheng; Zhai Young Zhu; Xue Can Zou; Xye Rong Zhan; Au Zia Zhao; Yue Feng Zhang; Da He Zheng; Shan Cien Zhang; Nan Wei Zhang; Hua Yi Zhon; Ye Song; Gin Guan Wu; Yee Jan Wong; Xin Chang Shang; Zhong Wu Luo; Huseh Ta Tang; Wang Wu Dong; You Shui Wang; Zim Sheng Whang; Si Ou; Li Tun Cheng; Pan Shao Min; You Quan Lin; Bi Sheng Liu; Xu Yong Lu; Lu Tian Hao; Ghuan Li Liu; Rui Kan Lin; Xiang Keng Lin; Kong Zhi Li; Duan·Sheng Kin; Zhon Guan Li; Jin Lim Fu; Zhe Shung Jain; Hyei Gwor; Wing–Hon Cheng; Dai Zi He; Zhi Ping Gao; Xiang Nmu Gao; Yi Cheng Dong; Ei Young Giang; Son Shing Dong; Jia Reng Dong; Chi Chi Chung; Wor Oi Chin; Zhu F. Cheng; Son Ching Cheng; Gin Sen Cheng; Tia Sian Chen; Kan Guan Chen; Kai Q. Zeng; Guo Cheng Lin; Xiang Guan Cai; Xin Sing Zhou; Yong Qui Chi; Yong Ging Wu; Cian Gluan Yong; Cheng Ye Wu; Ming Guang Liu; Chun Lin Jin; Jan Yon Chung; Zhen Huan Weng; Kang Di Weng; Cheng Xiao Dai; Guo Ping Ye; Chang Qing Zhou; Mei Xi Chen; Jian Biao Weng; Dar Hua Wang; Fui Lin; Zhe Shung Jan; Zhong Ming Tian; Guan Jun Wang; Jian Yun Wan; Jia Wen Liu; Bao Jin Lui; Zhang Song Xhong; Xin Bin Zheng, Appellees,

v.

George MAUGANS, District Counsel of the United States Immigration and Naturalization Service—Baltimore District; David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals; Richard J. Sharkey, District Counsel of the US Immigration and Naturalization Service—Philadelphia District; J. Scott Blackman, District Director of the US Immigration and Naturalization Service—Philadelphia District; United States Immigration & Naturalization Service; Executive Office For Immigration Review; Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner of the US Immigration and Naturalization Service; Mary Maguire Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals, Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner of the U.S. Immigration and Naturalization Service; George Maugans, District Counsel of the U.S. Immigration and Naturalization Service, Baltimore District; David L. Milhollen, Director of the Executive Office for Immigration

Review and Chairman of the Board of Immigration Appeals; Richard J. Sharkey, District Counsel of the U.S. Immigration and Naturalization Service, Philadelphia District; J. Scott Blackman, District Director of the U.S. Immigration and Naturalization Service, Philadelphia District; Mary Maguire Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals, Appellants, in 95–7316, 95–7317, 95–7318, 95–7319, 95–7320 and 95–7321.

Nos. 95–7316, 95–7317, 95–7318, 95–7319, 95–7320 and 95–7321.

United States Court of Appeals, Third Circuit.

Argued Aug. 25, 1995.

Decided Oct. 24, 1995.

Sur Petition for Rehearing Dec. 27, 1995.

Craig T. Trebilcock, Stock & Leader, York, PA, Frances P. Rayer, Pepper, Hamilton & Scheetz, Philadelphia, PA, Beverly J. Points, York, PA, Ann Carr, Lancaster, PA, Robert S. Kitchenoff, David H. Weinstein (argued), Weinstein, Kitchenoff, Scarlato and Goldman, Philadelphia, PA, Kathleen Blanchard, Astra Merck, Inc., Wayne, PA, Sharon J. Phillips, New York City, Kurt A. Blake, Katherman & Heim, York, PA, for appellees Dek Fun Lin, Shimu Chen, Chao Wu, Sing Chou Chung, Dar Hwa Wang, Zhao Shan Zhao.

Philemina M. Jones, David M. McConnell, Gary G. Grindler (argued), United States

Department of Justice, Office of Immigration Litigation, Washington, DC, for appellants George Maugans, District Counsel of the United States Immigration and Naturalization Service—Baltimore District, David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Richard J. Sharkey, District Counsel of the United States Immigration and Naturalization Service—Philadelphia District, J. Scott Blackman, District Director of the United States Immigration and Naturalization Service—Philadelphia District, Immigration & Naturalization Service, Executive Office for Immigration Review, Janet Reno, United States Attorney General, Doris Meissner, Commissioner of the United States Immigration and Naturalization Service, Mary Maguire Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals.

Before: GREENBERG, COWEN and SAROKIN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This case involves the issue of whether an "entry" may be effected pursuant to section 101 of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101, merely by encroaching upon United States territorial waters without being detected or pursued by authorities. Also at issue is whether the district court accorded the Board of Immigration Appeals' ("BIA") construction of section 291 of the INA, 8 U.S.C. § 1361, which is the statute's burden of proof provision, the deference to which it was entitled under the standard the Supreme Court set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The related appeals before us arise from the *habeas corpus* petitions of six citizens of the People's Republic of China who are currently being held for deportation by the Immigration and Naturalization Service ("INS"). Petitioners Sing Chou Chung ("Chung"), Dek Fun Lin ("Lin"), Shimu Chen ("Chen"), Wu Chao ("Chao"), Shan Zhao ("Zhao") and Dar Hwa Wang ("Wang") set foot upon a Rockaway, Queens beach on June 6, 1993, after having traveled for three months in the cargo hold of the "Golden Venture," an alien smuggling ship carrying over 300 passengers. None of the petitioners ever left the beach area and all of them admittedly were arrested within thirty minutes of their arrival.

Chung, Lin, Chen, Chao, Zhao and Wang all had their legal claims adjudicated in exclusion proceedings. At their respective exclusion proceedings, the six petitioners' applications for asylum were denied and they were ordered excluded from the United States. They then filed *habeas corpus* petitions in the United States District Court for the Middle District of Pennsylvania, pursuant to section 106(b) of the INA, 8 U.S.C. § 1105a(b). All six petitioners proceeded to file motions in the district court for partial summary judgment on the issue of whether they had "entered" the United States within the meaning of the INA.[1]

On May 16, 1995, the district court held that petitioner Chung had "entered" the United States as a matter of law before he had reached dry land. *Chung v. Reno,* 886 F.Supp. 1172, 1184 (M.D.Pa.1995). As to the allocation of the burden of proof under section 291 of the INA, the district court further held that it was unreasonable for the BIA to place the burden upon illegal aliens to estab-

---

**1.** The question whether the petitioners had "entered" the United States is not merely a matter of semantics. Under the law, once an alien has "entered" the United States, that individual has certain rights that can be adjudicated only pursuant to a full deportation hearing. However, if the individual is found in the United States but never "entered" within the meaning of section 101 of the INA, the alien can be excluded through the summary process of an exclusion hearing.

lish that they were "free from official restraint." *Id.* at 1185. On June 6, 1995, the district court denied the government's motion for reconsideration and ordered deportation proceedings to commence against Chung within ten days. The government was ordered to release Chung if deportation proceedings were not commenced within that time period. On June 9, 1995, based upon its decision in *Chung,* the district court ordered the government to initiate deportation proceedings against petitioners Lin, Chen, Chao, Zhao and Wang.

The government appeals the district court's orders granting partial summary judgment on the issue of entry in the six petitioners' *habeas corpus* actions. As the district court interpreted our decision in *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954) too broadly and failed to accord the BIA's interpretation of the INA the required level of deference, we reverse.

## I.

### A.

These cases arise from the following series of events, as described in the BIA's decision in *Matter of G–,* Int.Dec. 3215, at 5–7 (BIA 1993). In the early morning hours of June 6, 1993, the "Golden Venture" struck a sandbar 100 to 200 yards offshore of Fort Tilden Military Reservation, which is located on the Rockaway Peninsula in the Gateway National Recreation Area in Queens, New York. The plight of "Golden Venture" first came to the attention of law enforcement officers at approximately 1:45 a.m. At that time, two United States Department of the Interior Park Police officers saw the ship, some of its passengers running on the beach and others attempting to swim ashore. At 1:58 a.m., the officers contacted the New York City Police Department ("NYPD") and other law enforcement agencies for assistance.

A formidable array of law enforcement officers soon arrived upon the scene. NYPD officers responded to the emergency call at 2:19 a.m. Soon thereafter a police cordon was set up to secure the beach area. Also involved in the rescue operation were police canine units, New York State Police helicopters equipped with searchlights, Coast Guard boats and helicopters and personnel from the New York Park Police, the Jacob Riis Park Police, the New York City Fire Department and the Emergency Medical Service. INS officials arrived at approximately 3:30 a.m.

Over 100 "Golden Venture" passengers remained on the ship to await the arrival of rescue personnel. Approximately 200 of the passengers, however, decided to hazard the fifty-three-degree waters and high waves by attempting to swim ashore. Although it appears that most of the people who ultimately reached the beach were too exhausted to go farther, about thirty passengers fled into the surrounding community before the perimeter of the beach had been sealed off. Others were arrested on the beach and held in a building on Fort Tilden Military Reservation. The police escorted passengers who needed medical attention to local hospitals where, after they received appropriate medical treatment, were placed in the custody of the INS.

At York County Prison, exclusion hearings were brought against the "Golden Venture" detainees, including the six petitioners. At their respective exclusion proceedings, the petitioners provided the following accounts of their arrivals: Chung, Lin and Chen said that they jumped from the ship, swam ashore and lay down in exhaustion until they were approached by an officer. Chao also said that he jumped from the ship and swam ashore. He came up on the beach near a fence, walked about thirty steps, changed his clothes and waited until some officers took him away. Zhao averred that he "almost walked to the street" before a police officer approached him approximately thirty minutes after his arrival on the beach. Wang stated that he jumped into the ocean, swam ashore, changed clothes and sat on the beach. While on the beach he was taken away by the officers after being given emergency care.

The BIA entered a final exclusion order in each of petitioners' cases after concluding that the aliens had not proven that they made an "entry" into the United States within the meaning of section 101 of the INA. All six petitioners and many of their "Golden Venture" co-passengers also applied for polit-

ical asylum in their exclusion hearings, alleging that they were being persecuted by China's one-child-to-a-family policy. Their applications for asylum were all rejected. Presently the petitioners, along with nearly half the "Golden Venture" passengers, are being detained at York County Prison in Pennsylvania.

### B.

The BIA addressed the issue of entry in *Matter of G–*, which involved the case of petitioner Sing Chou Chung, one of the "Golden Venture" passengers. Applying well-established law, the BIA defined "entry" as requiring satisfaction of the following three elements: "(1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest entry point; and (3) freedom from official restraint." *Id.* at 8 (citing *Correa v. Thornburgh,* 901 F.2d 1166, 1171 (2d Cir.1990); *Matter of Patel,* Int.Dec. 3157 (BIA 1991), 1991 WL 353524).

Since Chung landed on the beach, the BIA found that he had satisfied the "physical presence" requirement. The BIA also found that the second element of the entry test had been met because "the circumstances under which the *Golden Venture* landed, [Chung's] payment of money to a smuggling operation for passage to the United States, his lack of travel documents entitling him to enter this country, and his conduct once he came ashore" suggested that Chung intended to evade inspection at the nearest entry point. *Matter of G–,* Int.Dec. 135, at 13.

The determinative factor was whether Chung had satisfied the third element of the entry test, i.e., whether he was ever "free from official restraint." The BIA interpreted section 291 of the INA as placing the burden upon the "Golden Venture" aliens to establish that they were free from official restraint. The BIA recognized that "in cases where there is no clear evidence of the facts determinative of the entry issue, those cases ultimately must be resolved on where the burden of proof lies." *Id.* at 11. The BIA held that Chung did not "enter" the United

States because he had failed to meet this burden. *Id.* at 14–15.

### C.

Over 100 of the detainees, including the petitioners, filed *habeas corpus* petitions in the United States District Court for the Middle District of Pennsylvania, pursuant to section 106(b) of the INA, 8 U.S.C. § 1105a(b). As these petitions presented similar issues, the district court consolidated them under the caption *Yang You Yi v. Maugans,* No. 93–1702. The consolidation order, entered on November 15, 1993, consolidated "for all purposes" current and future *habeas corpus* petitions from the "Golden Venture" passengers detained at York County Prison.

After the district court's consolidation order had been entered, the six petitioners filed individual motions for partial summary judgment on the issue of whether they had effected an "entry" into the United States. On May 16, 1995, the district court granted petitioner Chung's motion for partial summary judgment, holding that he had entered the United States within the meaning of the INA. *Chung v. Reno,* 886 F.Supp. at 1185. The district court concluded that the BIA had applied the governing immigration law incorrectly in two areas. First, the court rejected the BIA's conclusion that all three elements necessary to establish that an entry into the United States has occurred must be satisfied while the alien is on "dry land." *Id.* at 1179. The district court interpreted our decision in *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954), as binding authority, which led it to conclude that Chung had satisfied all three elements of the entry test before he reached dry land. *Chung,* 886 F.Supp. at 1184.

The district court further held that the burden of proof had not been properly allocated by the BIA. The district court held that the INA's burden provision required Chung to establish only that had he made a physical entry into the United States at a point distant from an inspection station. *Id.* at 1185. Accordingly, the district court granted Chung's motion for partial summary judgment, concluding that he had entered

the United States as provided by the INA. *Id.*

The government sought reconsideration under Fed.R.Civ.P. 59(e). On June 6, 1995, the district court denied the government's motion and ordered deportation proceedings to commence against Chung within ten days. In separate one-page orders issued on June 9, 1995, the district court ordered deportation proceedings to begin within ten days for petitioners Lin, Chen, Chao, Zhao and Wang. On June 20, 1995, the district court denied the government's motion for a stay pending appeal. These appeals followed.

## II.

We must decide whether the petitioners were entitled to have their cases adjudicated in a deportation hearing, as opposed to the more summary exclusion proceedings which they did in fact receive. We also must decide, as between the alien and the government, who has the burden of proving that an alien was "free from official restraint" under section 291 of the INA, 8 U.S.C. § 1361. The district court had jurisdiction under section 106(b) of the INA, 8 U.S.C. § 1105a(b). We have jurisdiction pursuant to 28 U.S.C §§ 1291 and 2253. We review *de novo* the district court's grant of the *habeas corpus* petitions. *United States v. Cleary,* 46 F.3d 307, 309–10 (3d Cir.1995).

■ As the district court recognized, the BIA's findings of fact are conclusive and must be upheld "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). The BIA's interpretation of the INA is also entitled to deference pursuant to the Supreme Court's decision in *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. *See Fatin v. INS,* 12 F.3d 1233, 1239 (3d Cir.1993) (applying *Chevron* standard to the BIA's interpretation of the Refugee Act of 1980). Where Congress has not spoken directly on the issue, we ask only "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

## III.

Section 291 of the INA places the burden of proving entry as follows: "Whenever any person ... makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he ... is not subject to exclusion under any provision of this chapter...." 8 U.S.C. § 1361. The BIA interprets this section as placing upon aliens the burden to prove that they have established all three elements of the aforementioned "entry" test. The district court, however, shifted the burden of proof to the government to establish that the petitioners were not free from official restraint. It held that section 291 requires aliens to prove only that they have "physically entered the United States at a point distant from an inspection station." *Chung,* 886 F.Supp. at 1185. In so holding, the court relied upon the Eastern District of New York's decision in *In re Application of Phelisna,* 551 F.Supp. 960 (E.D.N.Y.1982).

Three days after the district court's decision in *Chung,* the Court of Appeals for the Second Circuit expressly overruled *Phelisna*'s holding concerning the proper allocation of the burden under section 291. *Xin–Chang Zhang v. Slattery,* 55 F.3d 732 (2d Cir.1995). The *Zhang* court held that the INA was ambiguous on the allocation of the burden of proving entry, but deferred to the BIA's interpretation of section 291 because it was not unreasonable. *Id.* at 756. On reconsideration, the district court in this matter rejected the Second Circuit's reasoning. The district court placed the burden upon the government to establish lack of freedom from official restraint, concluding that the government is in the better position to know when and how it placed the alien into custody or under surveillance. *Chung v. Reno,* No. 94–1702, slip op. at 9 (M.D.Pa. June 6, 1995).

■ The BIA's interpretation of the burden of proof provisions of the INA is entitled to deference under the standards set forth in *Chevron.* As this court indicated in *Fatin v. INS,* 12 F.3d at 1233, *Chevron* requires the following principles to be applied when we review the BIA's interpretation of INA:

[I]n considering an interpretation adopted by the Board, we must ask whether Congress has directly spoken to the precise question at issue. If it has not, we may not simply impose [our] own construction on the statute. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 1239 (citations and internal quotation marks omitted). We do not believe that the BIA's interpretation of section 291 is unreasonable. *See Zhang,* 55 F.3d at 756. We therefore hold that under the INA, aliens have the burden of proving that they have satisfied all three elements of the entry test before they are eligible for deportation proceedings.

### IV.

■ The United States' immigration laws prescribe two types of proceedings in which aliens may be expelled from the country—deportation hearings and exclusion hearings. *Landon v. Plasencia,* 459 U.S. 21, 25, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). Our immigration laws also distinguish between aliens who have "entered" the United States, regardless of whether such "entry" was legal, and aliens who come to our borders seeking admission. *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). Aliens who have "entered" enjoy more rights and privileges than those who are still "on the threshold of initial entry." *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953)). The INS may deport an alien who has effected an "entry" only pursuant to a deportation proceeding, whereas it may exclude an alien who has not "entered" through to an exclusion hearing. *Landon,* 459 U.S. at 25, 103 S.Ct. at 325. In deportation proceedings, aliens receive many advantages that they are not entitled to in exclusion proceedings, including advance notice of the charges against them, direct appeal to the Court of

Appeals and a right to designate the country of destination. *Correa,* 901 F.2d at 1171 n. 4.

### A.

■ The first element of the entry test requires aliens to establish that they were physically present within the territorial limits of the United States. The district court's finding that the "physical presence" requirement of the entry test was satisfied while the "Golden Venture" passengers were still aboard the ship expressly rejected the reasoning of both the Second and the Fourth Circuits in other *habeas corpus* cases arising from the same incident.[2] *See Zhang,* 55 F.3d at 732; *Chen Zhou Chai v. Carroll,* 48 F.3d 1331 (4th Cir.1995). In *Chen,* the Court of Appeals for the Fourth Circuit held that "mere presence in the territorial waters of the United States does not constitute an entry into the United States." *Id.* at 1343. Similarly, as the Court of Appeals for the Second Circuit reasoned in *Zhang,* "United States immigration law is designed to regulate the travel of human beings, whose habitat is land, not the comings and goings of fish or birds." *Zhang,* 55 F.3d at 754. Interpreting the same provision of the INA, the Second Circuit held that "an alien attempting to enter the United States by sea has not satisfied the physical presence element ... at least until he has landed." *Id.*

The district court rejected the Second and Fourth Circuits' *terra firma* rule in part because it concluded that our decision in *Vasilatos* was binding. *Vasilatos* involved a Greek seaman who was convicted of entering the United States after having been deported. Vasilatos was a crew member aboard a Greek ship that arrived in Philadelphia as its first port of call. *Vasilatos,* 209 F.2d at 196. In Philadelphia an immigration officer asked Vasilatos if he had ever been deported. Vasilatos lied and was granted admission for a twenty-nine-day stay in the United States. *Id.* at 196–97. Vasilatos did not leave the ship in Philadelphia. The ship sailed on to Baltimore, where Vasilatos jumped ship. He was arrested in New York the following year. *Id.* at 197.

---

**2.** Only about half the "Golden Venture" passengers are being detained at York County Prison.

Passengers detained in other jurisdictions have initiated similar cases in other courts.

Vasilatos was tried and convicted in the Eastern District of Pennsylvania for feloniously attempting to enter the United States after having been deported. Vasilatos challenged the court's venue, claiming that he had not entered the United States in Philadelphia. The *Vasilatos* court rejected this argument, reasoning that the "presence in the United States which is essential to entry existed when, and even before, the ship arrived in Philadelphia." *Id.* Moreover, "[t]he other essential factor, freedom from restraint, came into existence when an immigration officer in Philadelphia cleared Vasilatos for a temporary stay in the United States." *Id.* Since Vasilatos had "entered" the United States in Philadelphia, we held that the venue of Vasilatos' trial was properly in the Eastern District of Pennsylvania. *Id.* at 198.

The district court concluded that *Vasilatos* mandates a departure from the Second and Fourth Circuits' decisions in *Zhang* and *Chen.* We disagree. The district court failed to consider the changes that Congress made in the immigration laws in 1952. As the Senate Report discussing the INA observed, "[t]he purpose of the bill is to repeal all immigration and nationality laws and to enact a completely revised immigration and nationality code." S.REP. No. 1137, 82d Cong., 2d Sess. 1 (1952). Although *dictum* from *Vasilatos* supports the district court's decision,[3] the *Vasilatos* court made plain that its decision was governed by the immigration laws in existence before Congress enacted the INA. *Vasilatos,* 209 F.2d at 196.

Before the INA was enacted in 1952, Congress had not provided a statutory definition of "entry." *Id.* at 197. "As a result, courts struggled to define what constitutes an entry for immigration purposes." Mitchell Scott Bloom, Note, *The Disproportionate Effect of the Entry Fiction on Excludable Aliens,* 9 B.C. Third World L.J. 271, 275 (1989). "Entry" is now statutorily defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession," excepting certain situations not applicable here. 8 U.S.C. § 1101(a)(13).

The definition of "United States" that the *Vasilatos* court interpreted is to be found in section one of the Immigration Act of 1917, 8 U.S.C. § 173 (repealed). This section stated that "[t]he term 'United States' shall be construed to mean the United States, and *any waters,* territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone...." *United States v. Maisel,* 183 F.2d 724, 726 (3d Cir.1950) (quoting statute) (emphasis added). Section 101 of the INA provides the current definition of "United States":

> The term "United States," except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States.

8 U.S.C. § 1101(a)(38). Significantly, the current version does not include waters or airspace subject to the jurisdiction of the United States. Nor can it be said that the current definition implicitly includes territorial waters. As the language of section 101 suggests, the INA provides expressly to the contrary. In the provision regulating travel of citizens and aliens during time of war or national emergency, the definition of the term United States "includes the Canal Zone, and *all territory and waters, continental or insular,* subject to the jurisdiction of the United States." *Id.* at § 1185(c) (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (citations omitted).

Furthermore, the United States Code contains a variety of definitions for the term

---

**3.** The *Vasilatos* court noted that "[i]t must have been apparent, long before the fact was emphasized in the 1952 definition, that in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation." *Vasilatos,* 209 F.2d at 197.

"United States" for use in various contexts.[4] Given the multitude of definitions Congress provided for "United States" in different contexts, we think it behooves a court to adhere strictly to the statutory definition applicable to the situation at bar. We therefore conclude that under the Immigration and Nationality Act of 1952, merely crossing into the territorial waters of the United States is insufficient to constitute physical presence for the purpose of determining whether an alien has entered the United States. The "physical presence" requirement of the entry test can be satisfied only when an alien reaches dry land. *See Zhang*, 55 F.3d at 754 (Zhang "was not physically present until he came to the beach"); *Chen*, 48 F.3d at 1343 (Chen never entered the United States because he was apprehended "before he reached the shore").[5]

### B.

■■■ The second prong of the entry test requires "(a) an inspection and admission by an immigration officer or (b) actual or intentional evasion of inspection at the nearest inspection point." *Correa*, 901 F.2d at 1171 (citations omitted). Since the petitioners were not inspected and admitted by an immigration officer, we focus upon the latter requirement. Neither the district court in its decision nor the government on appeal has challenged the BIA's finding that Chung actually and intentionally evaded inspection. The district court nonetheless concluded that this requirement was satisfied before the petitioners reached dry land. *Chung*, 886 F.Supp. at 1184. Because the government has not challenged the BIA's findings as to whether the petitioners actually and inten-

tionally evaded inspection at the nearest place of inspection, and since the district court did not pass on these findings as to five of the petitioners, we decline to reach that issue on appeal. We do observe, however, that since the first element of the entry test (physical presence) can only be satisfied on dry land, it follows that the second element (actual or intentional evasion of inspection at the nearest inspection point) must also be satisfied on dry land. By definition it would appear that such evasion also must occur within the "United States," as defined by the INA.

### C.

■■■ The Court of Appeals for the Second Circuit has defined the third element of the entry test, freedom from official restraint, as "mean[ing] that the alien is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on." *Correa*, 901 F.2d at 1172. This requirement can be satisfied only after a finding of physical presence in the United States, because such freedom while outside the United States is irrelevant. The authority that best supports the petitioners' contention that they were "free from official restraint" on June 6, 1993, is the Court of Appeals for the Ninth Circuit's decision in *United States v. Martin–Plascencia*, 532 F.2d 1316 (9th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). *Martin–Plascencia* involved a Mexican juvenile who sought to bypass immigration authorities in and around the port of entry at San Ysidro, California. *Id.* at 1317. He did so by avoiding

---

**4.** For example, Chapter 47, Consumer Product Safety, of Title 15, Commerce and Trade, defines the "United States" to "mean[ ] all of the States." 15 U.S.C. § 2052(a)(14). Under the Federal Unemployment Tax Act, "[t]he term 'United States' ... includes the States, the District of Columbia, the Commonwealth of Puerto Rico, and the Virgin Islands." 26 U.S.C. § 3306(j)(2). Under the Longshore and Harbor Workers' Compensation Act, "[t]he term 'United States' ... means the several States and Territories and the District of Columbia, including the territorial waters thereof." 33 U.S.C. § 902(9). Finally, under Title 18 of the United States Code, Crimes and Criminal Procedure, "[t]he term

'United States' ... includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone." 18 U.S.C. § 5.

**5.** The dissent argues that the majority's standard is vague and can lead to absurd results because it is unclear what "dry land" means. Dissent at 1554–55. The dry land standard requires that the alien reach the shore and be out of water. This is the logical import of the Second and Fourth Circuits' reasoning and analysis and is consistent with our interpretation of the entry test today. We see no ambiguity here.

the questioning and inspection areas and, out of the view of the immigration officials, crawled through an opening in a six foot chain link fence and then under a second eight foot chain link fence. [Martin–Plascencia] was attempting to scale a concrete wall onto a San Ysidro street when apprehended. At this point of the entry, [Martin–Plascencia] was no less than 50 yards into the United States.

*Id.*

■ Notwithstanding the fact that Martin–Plascencia failed to escape the confines of the port of entry before he was arrested, the *Martin–Plascencia* court held that he had effected an entry into the United States pursuant to the INA. We expressly reject and depart from the Ninth Circuit's reasoning and analysis. When an alien attempts to enter the United States, the mere fact that he or she may have eluded the gaze of law enforcement for a brief period of time after having come upon United States territory is insufficient, in and of itself, to establish freedom from official restraint. *Cf. Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982) (fifty-three Haitians who were apprehended shortly after they came ashore on a Florida beach all processed in exclusion proceedings), *cited in Matter of G–,* Int.Dec. 3215, at 10 n. 5.

■ Based upon the administrative record before us, it is clear that none of the petitioners have satisfied their burden that they were free from official restraint. None of the petitioners ever left the beach area, which was teeming with law enforcement activity soon after the "Golden Venture" ran aground. Nor were any of the petitioners "free to ... go at large and mix with the general population." *Correa,* 901 F.2d at 1172; *Matter of Pierre,* 14 I & N Dec. 467, 469 (BIA 1973). Far from indistinguishably mixing with the general population, petitioners either were apprehended shortly after coming ashore, or were brought into custody as a result of immediate and intense law enforcement efforts. We therefore conclude that the petitioners were never free from official restraint.

## V. CONCLUSION

For the foregoing reasons, we hold that the petitioners could not have effected an "entry" into the United States until they reached dry land. We also hold that the petitioners have the burden of proving that they meet all the requirements of "entry" in order to be entitled to a deportation hearing. We therefore will reverse the district court's orders and remand the cases for further proceedings consistent with this opinion.

SAROKIN, Circuit Judge, dissenting:

The issue presented here is not whether petitioners shall be excluded or deported, but rather what due process rights shall be accorded to them in connection with that determination. Although the inroads which these petitioners made into this country were brief both in distance and time, they were sufficient under existing precedent to satisfy the requirements entitling them to a deportation hearing with its enhanced protections. Whether they will be permitted to stay will be determined in those hearings; all that we decide today is whether those hearings will be full and fair or brief and limited. That petitioners arrived in this country illegally, intending to do so, is not disputed and reflects upon them and the conditions in their own country which forced them to undertake such a hazardous journey. The process by which we deal with them, however, reflects upon our nation and our basic traditions; it is this process that makes such a journey worthwhile to so many.

### I.

As the ship "Golden Venture" headed within sight of New York in the early morning hours of June 6, 1993, the approximately 300 Chinese nationals aboard were in the final stages of a long escape from the People's Republic of China (PRC). As described by this court in an earlier decision in this litigation, they endured much hardship in the course of their journey. First they traveled overland, through the mountains of the PRC and Burma to the jungles of Thailand. *See Yi v. Maugans,* 24 F.3d 500, 502 (3d Cir. 1994) (denying class certification for the "Golden Venture" passengers). There they

climbed into the cargo hold of the smuggling ship "Golden Venture," settling in for a long journey that they hoped would successfully, though illegally, bring them to the United States. *Id.* The ship sailed for over 100 days—days during which the passengers sat in the bowels of the ship. The culmination of this arduous journey was the grounding of the vessel a mere 100 to 200 yards off the shore of the Gateway National Recreation Area in Queens, New York. *Id.*

As set forth in *Matter of G–*, Int.Dec. 3215, at 5–7 (BIA 1993), the passengers on the ship were in desperate straits once it ran aground:

> According to newspaper accounts of several passengers interviewed, pandemonium erupted on board when the ship was grounded. Passengers began spewing out of the cargo hold of their ship, where they had been forced to stay during their 3-month–long voyage. They crowded the ship's deck, only to be told by the ship's crew to jump overboard.

*Id.* at 6.

By the time the ship was first spotted by two park police officers at 1:45 a.m., its passengers were well into an evacuation from the distressed ship. Some of the passengers were already running on the shore, others were in the water, swimming and wading towards the beach, and still others were on board the ship awaiting rescue. At some unspecified time after the arrival of the first rescue personnel at 2:19 a.m., a cordon was established on a portion of the beach, about ¼ to ½ mile long, extending 600 yards inland from the water line.

All six of the petitioners in the instant appeal had reached the beach prior to being encountered by rescue personnel. I recount their individual stories here as they presented them below to the BIA.

Petitioner Dek Fun Lin jumped off the ship after it ran aground. Appendix ("App.") at 144. With difficulty, he swam to shore. When he arrived, he was too exhausted to move and rested on the beach with other passengers from the boat. *Id.* About a half an hour after he arrived, someone in a uniform came up and wrapped him in a blanket, and then others came and offered him medical help. *Id.*

Petitioner Shimu Chen climbed to the deck of the ship when it ran aground and spotted a helicopter. *Id.* at 158. He then followed other passengers and jumped into the water. He struggled to shore where he lay, too exhausted to "continue [his] escape." *Id.* at 159. A man approached him after an unspecified amount of time and carried Chen to a group of other Chinese people where he rested and was looked after until he could be brought to the Red Cross. *Id.*

Petitioner Wu Chao swam for about half an hour in the water before arriving on the beach. *Id.* at 175. When he made it to shore, Chao noticed about ten or fifteen other Chinese nationals on the beach with him, as well as some fences nearby. Then he lay down to rest because he was too exhausted from his swim to leave the beach. *Id.* at 181–82. He was on the beach for a "pretty long time" before he was taken by people wearing blue and white to a place where he received medical attention. *Id.* at 176–77.

Petitioner Sing Chou Chung dove into the water from the "Golden Venture" and swam to shore. Being a weak swimmer, he was exhausted upon arriving there and rested. About a half-hour after he arrived on the beach, Chung was approached by someone in a uniform whom he believes to be a policeman. This person offered him a blanket. He was also given medical care by people wearing white uniforms. Then Chung was handcuffed by police and brought to the hospital. *Id.* at 206.

Petitioner Shan Zhao also arrived on shore on his own. Once on land, he claims that he "almost walked to the street," *id.* at 213, prior to being approached by an official about 30 minutes after he arrived on the beach. *Id.* at 216.

Petitioner Dar Hwa Wang arrived on the beach and noticed that the only other people around were other passengers from the vessel. *Id.* at 235. After "some time," the length of which was unspecified in the record, Wang was given a blanket by "some people," and then about a half an hour later,

was taken to an immigration office and then incarcerated. *Id.* at 236.

The first immigration officials arrived on the scene at about 3:30 a.m., some time after the rescue operation was well underway. *In Matter of G–*, Int.Dec. 3215, at 7. No effort was made to differentiate or keep track of which passengers were found on the shore, which were rescued from the water, which were rescued from the boat, or which were taken to medical facilities. Rather, "[i]mmigration officials processed all detainees as one large group." *Id.* The captain of "Golden Venture" and his crew were arrested pending criminal prosecution for smuggling by the evening of the grounding.

The six petitioners in the instant case, along with about half of their compatriots from the doomed smuggling ship, were taken to York County Prison on June 7, 1993, the day after their tumultuous arrival. They have been detained there ever since—a period of twenty-seven months to date, which followed 100 harrowing days at sea.

## II.

In the instant habeas corpus action petitioners claim that they are entitled to deportation hearings rather than exclusion proceedings because they "entered" the United States within the meaning of the Immigration and Nationality Act ("INA"). The type of proceeding to which they are entitled is significant to the petitioners. The procedural protections provided to applicants in deportation hearings are significantly greater than those available to asylum seekers in exclusion proceedings. As the Second Circuit has noted:

> Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, the right to seek suspension of the order, and the right to designate the country of destination....
>
> Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection.

*Correa v. Thornburgh*, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990) (citation omitted).

I respectfully dissent because I believe that the district court was correct in determining that the petitioners here are entitled to adjudicate their asylum claims in deportation hearings with their attendant due process protections. The district court properly concluded that the "Golden Venture" passengers were both physically present and free from official restraint from the time they crossed into the territorial waters of the United States. I also concur with the district court determination that the six petitioners actually and intentionally evaded inspection, although as explained herein, this test ordinarily would not be met by merely crossing into United States territorial waters.

### A.

The territorial waters of the United States extend twelve miles from its shores.[1] Petitioners contend, and the district court held, that they were physically present in the United States the moment they crossed into its territorial waters.

I do not contest either the Fourth Circuit's statement, or the majority's reliance upon it, that "mere presence in the territorial waters of the United States does not constitute entry into the United States." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1343 (4th Cir.1995); Majority Opinion, at 1547. The issue is not whether physical presence *alone* constitutes entry, but rather whether the first prong of the three-prong entry analysis is met by crossing into the territorial waters of the United States. I believe that it is.

I base my conclusion on case law, statutory construction, and clear logic. Like the district court, I am convinced that *United States*

---

1. Until recently, the territorial seas of the United States were limited to within three miles from the coast. President Reagan extended this to twelve miles by Presidential Proclamation in 1988. Exec. Order No. 5928, 54 Fed.Reg. 777 (1989). *See* 8 C.F.R. § 287.1(a)(1) (defining "external boundaries" of the United States as "the land and boundaries and the territorial sea of the United States extending 12 nautical miles from the baseline of the United States....").

*v. Vasilatos,* 209 F.2d 195 (3d Cir.1954), mandates this conclusion. In *Vasilatos,* the court made very clear that Vasilatos was physically present in the United States prior to arriving on land: "[T]hat presence in the United States which is essential to entry existed when, *and even before,* the ship arrived in Philadelphia. *No landing was necessary* to supply that prerequisite." *Id.* at 197 (emphasis added).

The majority finds *Vasilatos* inapplicable here, making much of the fact that, at the time Vasilatos entered the United States, the INA as it exists today was not yet enacted. Specifically, the majority discredits *Vasilatos* because "[t]he definition of 'United States' that the *Vasilatos* court interpreted" was repealed and replaced by different language when Congress enacted the INA in 1952. *See* Majority Opinion, at 1548. Yet there is no discussion in the *Vasilatos* opinion at all about interpreting the phrase "United States."

Rather, the court looked to the definition of "entry," the word at the heart of this case. *Vasilatos,* 209 F.2d at 197. The court noted that the word "entry," defined in section 101(a)(13) of the INA of 1952 as "any coming of an alien into the United States from a foreign port or place," 8 U.S.C. § 1101(a)(13), was not defined in the immigration laws applicable at the time the *Vasilatos* case arose. However, it concluded:

> It must have been apparent, long before the fact was *emphasized in the 1952 definition* [of entry], that in a literal and *physical* sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation.

*Id.* at 197 (emphasis added). Thus, the court in *Vasilatos* believed that the 1952 definition of "entry" actually *"emphasized"* its conclusion that a person is physically present in the United States upon crossing into territorial waters. Clearly, then, the *Vasilatos* court

thought that the phrase "United States" appearing in the 1952 definition of "entry" included territorial waters.

Even if the majority were correct that *Vasilatos* was based on a now repealed definition of "United States," I think the majority misreads the current statute when it concludes that the term "United States" for purposes of entry does not include territorial waters for three reasons. First, I read the definition of the "United States" supplied in section 101(a)(38) of the INA to include territorial waters. Second, section 215 of the INA and its more specific definition of the "United States", which the majority cites in an effort to show that the general definition of "United States" does not include territorial waters, demonstrates that Congress explicitly *did* anticipate that aliens may have achieved entry by coming into the territorial waters. Third, I am convinced that the majority's conclusion that physical presence can only be accomplished on dry land is too vague and would lead to absurd results in its application. I will address each of these points in turn.

1.

Section 101 of the INA, the definitions section, provides that "United States" is defined as "the *continental* United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C. § 1101(a)(38) (emphasis added). The government asserts, and apparently the majority agrees, that the word "continental" means that this definition encompasses only dry land. The word "continental," however, is used merely to distinguish offshore states and territories from the lower forty-eight states. This conclusion finds support in 8 C.F.R. § 215.1(f) which reads, "The term *continental United States* means the District of Columbia and the several States, except Alaska and Hawaii." (emphasis in original).[2]

---

2. While I recognize that 8 C.F.R. § 215 is a codification of section 215 of the INA, the statutory section the majority posits has an expanded definition of "United States," I find the definition in the regulation instructive for purposes of the general meaning of "continental United States." I further note that the phrase "continental Unit-

ed States" does not exist in the definition of "United States" presented in section 215(c) of the INA, and conclude that the phrase at it appears in 8 C.F.R. § 215 was borrowed from the general definition of "United States" for the whole INA.

2.

The majority argues that the definition of "United States" in section 101(a)(38) of the INA cannot mean more than dry land because another section of the Act, section 215(c), presents a more specific definition of "United States" for the purposes of that provision, which includes "all territory and waters, continental or insular." 8 U.S.C. § 1185(c). The majority contends that this definition would be meaningless if territorial waters were already part of the general definition of "United States" in section 101(a)(38) of the Act. Majority Opinion, at 1548–49.

Yet, the section 215(c) definition of "United States," along with its inclusion of territorial waters, applies to a provision of the INA that is *about entry,* and even specifically, the illegal transport of aliens. Thus section 215 and its definition of "United States" actually disproves the majority's point. Section 215(a)(1) provides:

[I]t shall be unlawful for any alien to depart from or *enter* or attempt to depart from or *enter the United States* except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1) (emphasis added). Section 215(a)(2) provides:

[I]t shall be unlawful for any person to transport or attempt to transport from *or into the United States* by another person with the knowledge or reasonable cause to believe that the departure or *entry* of such other person is forbidden by this section.

8 U.S.C. § 1185(a)(2) (emphasis added).

Section 215 actually demonstrates that Congress *did* envision that an alien could be physically present in the United States for purposes of entry by crossing into the territorial waters. Indeed, it seems apparent that Congress included the more specific definition of "United States" in this section to emphasize this point, thus ensuring that the President has adequate authority to regulate the entry and departure of aliens into and from the United States.

3.

Finally, I believe it would be impossible to base a determination of physical presence in the United States on arrival on land because it is unclear precisely what "dry land" means. Does this mean touching shore that is not covered by any water at all? What is the effect of high and low tides? Has an alien reached dry land upon standing on a beach that is moist with ocean water, or does the sand need to be perfectly dry? These questions may seem absurd, but they demonstrate how difficult it would be to premise these determinations on such a vague standard which changes as constantly as the tides.

Accordingly, I agree with earlier precedent that, for the purposes of determining physical presence, crossing into the territorial waters of the United States is sufficient. This of course does not mean that crossing into the territorial waters alone is sufficient to constitute entry. Indeed, as long established by the U.S. Supreme Court, an alien can be physically present in the United States and still not have entered the U.S. within the meaning of the INA. *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958). For that, an alien must satisfy the other two prongs of the test.

B.

The second prong of the "entry" test requires that an alien be either inspected and admitted by an immigration officer, or that he or she actually and intentionally evade inspection at the nearest inspection point. The BIA found in the cases of three petitioners, Chao, Chung and Wang, that they had affirmatively met this standard, App. 163, 203, 222, and it made no specific finding on this issue one way or the other for petitioners Lin, Chen and Zhao. App. at 141, 146–47, 211. The majority declined to resolve this issue directly, but implied that an alien must first reach dry land prior to actually and intentionally evading inspection. I agree that this issue need not be expressly resolved on appeal because the government never contested that the six petitioners, all of whom arrived on dry land prior to being ap-

proached by any government officials, had actually and intentionally evaded inspection. However, because I consider this prong of the entry analysis to be an important piece of the entire entry puzzle, I will explore this issue in some detail.

In finding that petitioners Chao, Chung and Wang had actually and intentionally evaded inspection, the BIA looked to the conclusion in *Matter of G—,* Int.Dec. 3215 (BIA 1993). In *Matter of G—,* the BIA determined that another passenger from "Golden Venture" demonstrated intent to evade inspection:

> [N]owhere in the record is there evidence suggesting that the applicant deliberately surrendered himself to the authorities for immigration processing, or that, once ashore, he sought them out, voluntarily awaited their arrival, or otherwise acted consistently with a desire to submit himself for immigration inspection. In fact, given the circumstances under which the *Golden Venture* landed, the applicant's payment of money to a smuggling operation for passage to the United States, his lack of travel documents entitling him to enter this country, and his conduct once he came ashore, we find that the requisite intent to evade can be sufficiently gleaned from the record.

*Matter of G—,* Int.Dec. 3215, at 13 (BIA 1993).

This analysis, when applied to the stories of each of the six petitioners in this appeal, makes clear that all of them satisfied the actual and intentional evasion prong: all of them paid money to be smuggled to the United States; none of them carried travel documents; and none of them sought out immigration inspectors once ashore. However, it leaves open the question of whether "Golden Venture" passengers who were either rescued while in the water or while still aboard the ship met this prong.

In its briefs before the court, the government argues that inspection stations are always on land, and thus, in order to have actually evaded inspection, an alien would necessarily have to be on land. While I agree that in most circumstances this would be true, I also am aware that there are at least some circumstances in which inspections take place at sea. The Coast Guard commonly engages in activity related to enforcing immigration laws. For example, during the exodus of thousands of Haitians from Haiti in the early 1990's, the Coast Guard interdicted aliens on the high seas to prevent their illegal entry into the United States. *See* Exec.Ord. No. 12,807, 57 Fed.Reg. 23,133 (1992) (ordering issuance of instructions "to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea").

I thus once again decline to accept a bright line rule that an alien must, unequivocally, be on dry land in order to meet a prong of the entry test. Rather, I think an analysis of numerous facts must be considered in determining whether an alien has actually and intentionally evaded inspection while still at sea. Such facts should include, but are not limited to: (1) whether an incoming vessel is heading toward an inspection site or is intending to avoid any; (2) the proximity of the vessel to an inspection site; (3) the distance traveled within the boundaries of the United States without encountering an inspection site or an inspecting officer; (4) whether the vessel has reached a harbor or other protected area as opposed to being in the open sea; and (5) the presence or absence of government ships or airplanes that could interdict or observe incoming vessels.

In this case, I find the facts tend to support a conclusion that all passengers aboard "Golden Venture" actually and intentionally evaded inspection, regardless of whether they arrived on land. I find that all the detail in the record about the nature of the smuggling operation demonstrated *intent* to evade inspection. Given that "Golden Venture" (1) was not heading toward an ordinary inspection site; (2) was not, as far as the record reveals, in the vicinity of an inspection site; (3) had traveled virtually twelve miles into United States territory; (4) was apparently not in the open ocean but rather in a harbor or other kind of protected area; and (5) had successfully evaded Coast Guard vessels that were allegedly in the area looking

for it,[3] I would be inclined to conclude that all of its passengers *actually* evaded inspection. However, given the lack of evidence on the record as to the distance of the vessel from the nearest inspection station and the geographical nature of the harbor or bay where it ran aground, I would remand this determination to the district court for further fact-finding before making an entry determination.

### C.

The BIA based its determination that the petitioners in this case never achieved entry on the grounds that they were never free from official restraint. The majority agrees with the BIA's determination, dismissing Ninth Circuit case law as nonbinding on the Third Circuit and concluding that the petitioners had failed to meet their burden of proving they were free from official restraint. As I discuss, *infra,* I disagree with the court's analysis of the burden of proof question. I also disagree with the majority's conclusion that the petitioners were not free from official restraint because I am persuaded that statutory authority and case law cannot support such a conclusion.

"Freedom from restraint" means an alien attempting entry is not under governmental constraint that would "otherwise prevent her from physically passing on." *Correa,* 901 F.2d at 1172, (citing *Vasilatos,* 209 F.2d at 197). This restraint can be effected by someone other than an immigration official. *See Vasilatos,* 209 F.2d at 197 (finding restraint of plaintiff was effected by the master of the ship); *Correa,* 901 F.2d at 1172 ("restraint need not be by immigration officers"). Furthermore, official restraint can be accomplished through mere observation; actual physical restraint is not required. *See United States v. Aguilar,* 883 F.2d 662, 682 (9th Cir.1989), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991); *In re Pierre,* 14 Int.Dec. 467, 469 (BIA 1973) ("restraint may take the form of surveillance").

It is not, however, necessary that an alien act upon this freedom. *See Aguilar,* 883 F.2d at 683 ("where an alien is able to exer-

cise his free will subsequent to physical entry, he is not under official restraint"); *Matter of Patel,* Int.Dec. 3157 (BIA 1991), 1991 WL 353524 at *5 ("The critical point ... is that freedom from official restraint exists, not that such freedom has been exercised."). The majority includes no discussion in its analysis regarding whether the aliens aboard "Golden Venture" were free from official restraint prior to arriving on land. Unlike the majority, I have concluded, *supra,* that the petitioners were physically present in the United States prior to arriving on land. Accordingly, I consider whether freedom from official restraint was accomplished at the point of the petitioners' physical arrival in the United States—presence in our territorial waters.

Section 271(a) of the INA, 8 U.S.C. § 1321(a), and the case law that interprets it clearly indicate that an alien *could* be free from official restraint while still in the water. The statute reads in part:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft [or] transportation lines ... bringing an alien to, or providing a means for an alien to come to, the United States ... to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

8 U.S.C. § 1321(a).

This statute has been interpreted to mean that aliens who are physically present in the United States are nonetheless under official restraint by virtue of the duty placed on the owner, master, officer, or agent of the vessel. In *Vasilatos,* the court explained that aliens have not achieved entry merely by crossing into territorial waters "so long as they are detained there pending formal disposition of their requests." *Vasilatos,* 209 F.2d at 197. In support of this proposition, the Third Circuit cited to 8 U.S.C. (1946 ed.) § 146, *reenacted as* 8 U.S.C. § 1321, and noted "[t]he reasonableness of this concept is emphasized by the fact that the master of an incoming vessel is under a legal duty to restrict passengers and crew members to the ship pending immigration clearance." *Id.*

---

3. The record reveals that Coast Guard vessels had tracked "Golden Venture" but lost track of

the vessel prior to its crossing into territorial waters.

Similarly, in *Edmond v. Nelson*, 575 F.Supp. 532 (E.D.La.1983), the court determined that Haitian aliens were not free from restraint when they were aboard a ship in U.S. territorial waters because they were under restraint of the ship's captain who was following his section 271 duty:

> While the petitioners were not under 'official restraint,' in that they were not under arrest or in the custody of the INS, it is clear that they were under a restraint required by the statute that governs entry of aliens, a statute that contemplates that law-abiding ship's masters will act as did this ship's master. *For this reason,* entry was never effected.

*Id.* at 535 (emphasis added).[4] It can be inferred from *Edmond* that if the ship's captain had *not* acted according to the statute, but instead released the petitioners, or even told them to dive overboard upon approaching land, they would *not* have been under restraint any longer.

But for ship personnel's duty and authority under section 271 of the INA, then, passengers on board ships in U.S. territorial waters would be free from official restraint. In the instant case, the petitioners were carried into the territorial waters of the United States aboard a smuggling ship. Obviously, captains of smuggling ships are not officially restraining their passengers under section 271. Indeed, in this case, the master of the "Golden Venture" told the passengers to jump ship, *see Matter of G–*, Int.Dec. 3215 at 6, clearly indicating he was evading his duty under section 271 and defying the laws of the United States. Thus, I conclude that the passengers aboard "Golden Venture" were free from official restraint from the moment they crossed into the territorial waters of the United States.

However, I do *not* conclude that entry is achieved by merely crossing into U.S. territorial waters without being spotted by U.S. government officials. While I assert that passengers aboard a smuggling ship can be both physically present and free from official

restraint the moment they cross into U.S. territorial waters, passengers on board the ship have not entered within the meaning of the INA unless they have also actually and intentionally evaded inspection. As noted in my discussion of evasion of inspection above, only rarely will an alien be found to have actually evaded inspection prior to reaching land.

Furthermore, smuggling ships can still be spotted outside territorial waters and therefore be under official restraint by observation the moment they cross into territorial waters. Indeed, in the case of "Golden Venture," the ship was under surveillance by the Coast Guard prior to its entry into U.S. territorial waters; it was only after the ship disappeared from tracking devices that it was able to slip into the U.S. territorial waters.

### III.

While my analysis would preclude the need to address the burden of proof issue, I feel I must do so here because I cannot agree with the majority that the BIA's interpretation of section 291 of the INA is reasonable. Section 291 provides:

> Whenever any person ... makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he ... is not subject to exclusion under any provision of this chapter....

8 U.S.C. § 1361.

The district court concluded that section 291 does not place the burden of proving freedom from official restraint on the petitioners. Rather, the court originally relied upon *In re Application of Phelisna*, 551 F.Supp. 960 (E.D.N.Y.1982), and concluded that section 291 required nothing more than that petitioners bear the burden of proving they " 'came physically into the United States at some point not in the vicinity of an inspection station.' " *Chung v. Reno*, 886 F.Supp. 1172, 1185 (M.D.Pa.1995) (citing *Phelisna*, 551 F.Supp. at 963). As noted by

---

**4.** It is notable that the court in *Edmond*, a decision rendered *after* the enactment of the INA in 1952, did *not* rule that petitioners failed to achieve entry because they had not stepped on dry land. Rather, the court recognized they had "entered United States waters," noting *"[h]owev-*

*er ... petitioners were ... under lock and key detention by the ship's master,"* thus implicitly accepting that physical presence for purposes of entry was achieved by crossing into the waters. *Id.* (emphasis added).

the majority, the Second Circuit subsequently overruled *Phelisna*'s holding in *Zhang v. Slattery*, 55 F.3d 732, 756 (2d Cir.1995). The district court in this matter then revisited the issue and reached the same conclusion based on a finding that the BIA's interpretation of section 291 was not reasonable. *Chung v. Reno*, No. 94–1702, slip op. at 9 (M.D.Pa. June 6, 1995).

While I agree that the Second Circuit did overrule *Phelisna*'s holding regarding the burden of proof in *Zhang*, I feel it important to note that it did so only on the grounds of deference to administrative interpretation, not because it found the district court's statutory analysis in *Phelisna* to be inherently flawed. Indeed, the *Zhang v. Slattery* opinion explicitly agrees with the conclusion in *Phelisna* that there is " 'no express statutory provision allocating the burden of proving "entry." ' " *Zhang v. Slattery*, 55 F.3d at 756 (citation omitted). The Second Circuit overruled *Phelisna*'s ultimate conclusion only on the grounds that the agency's interpretation of the statute was "reasonable" and thus entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). *Zhang v. Slattery*, 55 F.3d at 756. The majority follows the Second Circuit's reasoning to reach the same conclusion.

I disagree with the majority because I do not find the BIA's statutory interpretation reasonable and thus determine it need not be accorded deference. *Id.* at 845, 104 S.Ct. at 2783 (explaining deference accorded to agency only if the interpretation "reasonable").

The BIA's interpretation of section 291 would require the petitioners to bear the burden of proving that they were not being observed by the government, observation being a form of official restraint. *See In re Pierre*, 14 I & N Dec. at 469. Because observation can "take the form of surveillance, *unbeknownst to the alien,*" *id.*, the alien would be required to prove something she does not know. Indeed, in this case, the ship *was* originally under Coast Guard surveillance prior to being lost again, and it is inconceivable that any of its passengers were aware of this at the time. I think it is unreasonable, impossible and inequitable to call upon the passengers aboard "Golden Venture" to prove they had not been under such surveillance and therefore conclude that the BIA erred in determining that the bur-

den of proof regarding freedom from official restraint lies with the aliens.

IV.

For the foregoing reasons, I would affirm the district court's decision.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SAROKIN, Circuit Judges.

SUR PETITION FOR REHEARING

Dec. 27, 1995

The petition for rehearing filed by appellees having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Sarokin would have granted rehearing in banc for the reasons set forth in his dissenting opinion.